**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

ROBERT V. ROSSI and
LINDA A. ROSSI,
Plaintiffs

v. C.A. No. 05-032-S

LEONARD P. GEMMA, Individually and
In his capacity as President of Gem Plumbing
& Heating Co., Inc.;
ROBERT J. LEVINE, Individually and in
his capacity as a general partner of
Gemma & Levine; and
HENRY S. KINCH, JR., in his capacity as Clerk of
The Providence County Superior Court
Defendants

RECEIVED APR 22 2005

**PLAINTIFFS' APPENDIX TO MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR TO ABSTAIN**

| | |
|---|---|
| Exhibit 1 | Notice of Intention |
| Exhibit 2 | 4/23/03 Decision of Superior Court Judge Silverstein |
| Exhibit 3 | Affidavit of Clinton Poole |
| Exhibit 4 | Affidavit of Robert V. Rossi |
| Exhibit 5 | Affidavit of Robert Quigley |
| Exhibit 6 | Judgment (Amended) |
| Exhibit 7 | *Gem Plumbing & Heating Co., Inc. v. Robert V. Rossi, et al.*, 867 A.2d 796 (R.I. 2005) |

19

ROBERT V. ROSSI
And LINDA A. ROSSI
By their attorney,

4/22/05

Patrick J. Dougherty
155 South Main Street, Suite 304
Providence, RI 02903
Ph (401)273-9770
Fax (401)273-4750

**CERTIFICATION**

I hereby certify that I caused a copy of this Appendix to be served on **Theodore Orson, Esquire**, Orson & Brusini, Ltd., 55 Dorrance Street, Suite 400, Providence, RI 02903; **Fred L. Mason, Jr., Esquire**, 20 Cedar Swamp Road, Smithfield, RI via first class postage prepaid mail on the 22nd day of April, 2005.

Robert V. and Linda A. Rossi
(Name of owner of record/Lessee)

17 Indigo Farm Drive, Harrisville, RI 02830
(Address of owner/Lessee)

*NOTICE OF INTENTION TO DO WORK OR FURNISH MATERIALS, OR BOTH*

All persons are hereby notified that the undersigned has within the one hundred and twenty (120) days prior to the mailing hereof done work, and furnished materials in preparation of an improvement on land described as follows: 28 Thurber Blvd., Smithfield, RI 02917, Plat 46, Lot 259, Book 274, Page 430 and that the land is owned by or leased to Robert V. and Linda A. Rossi. The nature of the work performed or material furnished is as follows: Installation of 8" and 2" ductile water service from street to building and installation of (1) town approved hydrant. Drop ship and install meter pit complete. Smithfield Water Department to be on site for inspection in accordance with their requirements. Taps in street included on 8" and 2" and chlorinate line upon completion. Inspection by Smithfield Water will be accomplished on T/M basis at $20.00 p/hr plus 10% mark-up unless owner pays direct. Police detail figured at $560.00 for a total of 16 hours and is being done for or furnished to: Rossi Law Office, 28 Thurber Blvd., Smithfield, RI 02917 and/or Sells/Greene Building Co., 25 Commercial Drive, Wrentham, MA 02093.

The approximate value of said work or materials is, as of the date of notice $35,500 and the undersigned has not been paid for the work or materials or both.

The undersigned authorizes Robert J. Levine, Esq. to act or sign documents in behalf of the undersigned in all matters pertaining to this notice, or any lien claimed hereunder, or release thereof.

You are hereby informed that the undersigned may within one hundred twenty (120) days of the performance of the work or furnishing of the materials, file in the records of land evidence of the city or town of Smithfield, a copy of this notice of intention to do work or furnish materials. The filling of the notice of intention, together with this mailing, will perfect a lien against the land described herein, under and subject to the provisions of the Rhode Island Mechanics' Lien Law.

Gem Plumbing & Heating Co., Inc.
544 Douglas Avenue
Providence, RI 02908
By It's Attorney

Robert J. Levine, Esquire

*NOTARIZATION CLAUSE*

Anthony P. Gemma
Notary Public #45756
Commission Expires 11-15-2003

Signed and sworn before me this 2 Feb day of Jan. 2002,

Notary Public
My Commission Expires:

112a

Filed: April 23, 2003

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, SC. SUPERIOR COURT

| | | |
|---|---|---|
| SELLS/GREENE BUILDING COMPANY, LLC, Petitioner | : | |
| v. | : | C.A. No. PB 02-1019 |
| ROBERT V. ROSSI AND LINDA A. ROSSI, Respondents | : | |

| | | |
|---|---|---|
| GEM PLUMBING & HEATING CO., INC., Petitioner | : | |
| v. | : | C.A. No. PB 02-2778 |
| ROBERT V. ROSSI AND LINDA A. ROSSI, Respondents | : | |

DECISION

SILVERSTEIN, J. Before this Court is the motion to dismiss submitted by Respondents Robert V. Rossi and Linda A. Rossi (collectively the Respondents). Gem Plumbing and Heating Co., Inc. (Gem) and Sells/Greene Building Company, LLC (Sells/Greene) (collectively the Petitioners) have timely filed objections to the motion.[1] Amicus curiae memoranda were invited by this Court. Several memoranda in this connection have been filed, including a submission by the Department of the Attorney General.

[1] Pursuant to the Stipulation of the parties filed January 2, 2003, the matter entitled Sells/Greene Building Company, LLC v. Robert V. Rossi and Linda A. Rossi, C.A. No. PB 02-1019, is consolidated with the matter entitled Gem Plumbing and Heating Co., Inc. v. Robert V. Rossi and Linda A. Rossi, C.A. No. PB 02-2778, for the purpose of resolving the issue of the constitutionality of the Mechanics' Lien Statute.

**Facts/Travel**

Respondents are the owners of property located at 28 Thurber Boulevard in Smithfield, Rhode Island. On October 27, 2000, Respondents signed a written agreement with a general contractor, Petitioner Sells/Greene,[2] for the construction of an office building and other improvements to the Smithfield property. Sometime subsequent to the execution of the agreement, construction commenced on the project.

In accordance with G.L. 1956 §§ 34-28-4 and -5[3], Sells/Greene recorded a notice of intention to do work or furnish materials or both (notice of intention) in the land evidence records for the Town of Smithfield on October 29, 2001. Thereafter, on November 14, 2001, Attorney John Bulman, on behalf of Sells/Greene, recorded an amended notice of intention in the land evidence records.

Less than 120 days later, on or about February 25, 2002, and pursuant to G.L. 1956 §§ 34-28-10 to -13, Sells/Greene filed a petition to enforce mechanics' lien and a notice of lis pendens. The amount claimed in the petition for unpaid labor and materials is $129,807.78.

In the meantime, Respondent Robert Rossi also contracted with Petitioner Gem Plumbing and Heating (Gem) to provide the materials and labor required to install water and sewer lines in connection with the construction of the office building. On January 28, 2002, Attorney Robert Levine, on behalf of Gem, recorded a notice of intention to claim a mechanics' lien. One hundred twenty (120) days later, on May 28, 2002, Gem

[2] Sells/Greene Building Company, LLC is a corporation organized and existing under the laws of the Commonwealth of Massachusetts and with its place of business located in Massachusetts. Sells/Greene has a certificate of authority to transact business in Rhode Island.

[3] G.L. 1956 §§ 34-28-4 and -5 are sections of Chapter 28, the Mechanics' Liens statute, the constitutionality of which is challenged by Respondent.

filed a petition to enforce mechanics' lien and a notice of lis pendens. The amount claimed in Gem's petition for unpaid labor and materials is $ 35,500.00.

On June 3, 2002, in response to both Sells/Greene and Gem's petitions to enforce, Respondents paid into the registry of the court two sums of money. First, in connection with the Sells/Greene petition, Respondents paid an amount of $130,404.66 (equaling the total amount of the notice of intention plus $596.88 in costs). Next, in connection with the Gem petition, Respondents paid an amount of $35,860.00 (equaling the total amount of the notice of intention plus $360.00 in costs).

Pursuant to G.L. 1956 § 34-28-17, on June 4, 2002, Respondents filed motions to dissolve, release and discharge mechanics' liens and lis pendens in the matters of both Sells/Greene and Gem. That same day, the court granted the motions filed in both matters, and orders were entered dissolving the mechanics' liens and notices of lis pendens, and stating that the amounts being held on deposit by the registry of the court are substituted to secure any valid mechanics' lien claim of the Petitioners.

Various pleadings and motions have subsequently been filed by all parties. The motion of consequence, as it pertains to this Decision, is the challenge to the constitutionality of the Mechanics' Liens statute, raised by Respondents in their memorandum in support of motion to dismiss petition and release funds from the registry of the court, filed on August 29, 2002. In accordance with Super. R. Civ. P. 24(d), Respondents served the Attorney General with a copy of the proceeding. This matter came to be heard on two occasions. Initially, this Court heard limited argument on September 27, 2002, at which time the Attorney General declined to intervene. Subsequent to this hearing, an order entered on October 23, 2002, inviting the Attorney

General and any party to file amicus curiae briefs. Additionally, this Court ordered that notice be given to the major building and construction trade associations for the purpose of advising them of this Court's invitation to file amicus curiae briefs. Finally, this order provided that this matter be scheduled for further hearing. Amicus briefs were subsequently filed by the Attorney General and various building and construction trade associations.

On January 2, 2003, a stipulation was filed by Petitioner Sells/Greene, Petitioner Gem Plumbing and Heating, and Respondents Robert and Linda Rossi, agreeing that the two separate matters may be consolidated for the purpose of resolving the issue of the constitutionality of the Mechanics' Lien Statute.

On February 6, 2003, this Court heard argument in full on the constitutional challenge, and opposition thereto. The central argument of the Respondents is that the Mechanics' Lien statute, G.L. 1956 §§ 34-28-1 to -37 (the statute), provides for a taking of property without any right to due process, in violation of the Fourteenth Amendment to the United States Constitution and the Rhode Island Constitution. Specifically, Respondents assert that the statute allows any person who claims to perform work or provide materials in construction to place a lien on the same property, without any pre or post-deprivation hearing procedure (short of a full, ultimate determination on the merits) to determine the validity or liability for the alleged debt underlying the claim. Moreover, the Respondents maintain, the only remedy afforded the property owner to remove the lien is to file a bond or deposit sufficient cash to cover the amount of the lien with the registry of the court. Therefore, contend the Respondents, any owner of property upon which a lien has been placed, faces a financial exposure and an interference with their

property rights, without the protections of constitutional due process. Accordingly, the Respondents argue that this Court should dismiss the petitions to enforce mechanics' liens and notices of lis pendens. Additionally, Respondents pray that the $166,264.66 and any accrued interest held in the registry of the court be returned to the Respondents.

Petitioners, on the other hand, advance a number of arguments in support of the constitutionality of the Mechanics' Liens statute. Generally, Petitioners aver that the property right affected is a very narrow one, that the level of governmental involvement is low, and that the protections in place are sufficient. The argument of the Attorney General mirrors that of the Petitioners, and asserts specifically that the filing of a mechanics' lien does not constitute a significant deprivation of a property interest and thus due process does not attach. In the alternative, the Attorney General contends that even if due process does attach, the statute provides sufficient safeguards. Arguments contained within the amicus curiae briefs echo the same notes in their support of the constitutionality of the statute. Accordingly, Petitioners, the Attorney General, and parties filing amicus briefs, all urge this Court to deny the motion to dismiss and the motion to release funds posed by the Respondents, and to find that the Mechanics' Liens statute is not unconstitutional.

**Standard of Review**

Our Supreme Court has held that the "Legislature is presumed to have acted within its constitutional power." Burrillville Racing Association v. State, 372 A.2d 979, 982 (1977). Thus, "[i]n cases that challenge the constitutionality of a statute, the party challenging its validity bears the burden of proving that the statute is unconstitutional." Rhode Island Insurer's Insolvency Fund v. Leviton Manufacturing Company, Inc., 716

A.2d 730 (R.I. 1998) (citing Power v. City of Providence, 582 A.2d 895, 903 (R.I. 1990). Moreover, "one who seeks a judicial veto of a legislative act on constitutional grounds carries that burden of persuasion." Burrillville Racing Association, 372 A.2d at 982. Therefore, Respondents, movants in this action, bear the burden of establishing that chapter 28 of title 34 of the Rhode Island General Laws is unconstitutional. This burden is great, given that courts will not invalidate a legislative enactment unless the challenger can "prove beyond a reasonable doubt" that the statute is "repugnant to a provision in the Constitution." Gorham v. Robinson, 186 A.832, 837 (1936).[4]

**The Mechanics of the Mechanics' Liens Statute**

A mechanics' lien is a claim created by law for the purpose of securing payment of the price or value of work performed and materials furnished in erecting or repairing a building or other structure or in the making of other improvements on land, and as such it attaches to the land as well as the buildings erected thereon. 53 Am Jur 2d *Mechanics' Liens* §1 (1996). Rhode Island's version of this claim is found in Chapter 28, of Title 34 of the General Laws of Rhode Island, entitled "Mechanic's Liens". This statute is intended to afford a liberal remedy to all who have contributed labor or material towards adding to the value of the property to which the lien attaches. Roofing Concepts, Inc. v. Barry, 559 A.2d 1059 (R.I. 1989). The purpose of this statute is to prevent unjust enrichment by one person at the expense of another. Art Metal Constr. Co. v. Knight, 185 A. 136 (1936). Specifically, G.L 1956 § 34-28-1(a) provides:

> "Whenever any building, canal, turnpike, railroad, or other improvement shall be constructed, erected, altered, or

[4] This Court notes that in the matter of Sells/Greene Building Company, LLC v. Robert V. Rossi and Linda A. Rossi, C.A. No. PB 02-1019, Respondent filed an answer in the case. Pursuant to Super. R. Civ. P. 81(a)(1), however, the Rules of Civil Procedure are not applicable to petitions for enforcement of mechanics' liens. Therefore, this Court will treat the answer as a nullity.

> repaired by oral or written contract with or at the oral or written request of the owner, the owner being at the time the owner of the land on which the improvement is located, or by the husband of such owner with the consent of his wife, the building, canal, turnpike, railroad, or other improvement, together with the land, is hereby made liable and shall stand subject to liens for all the work done by any person in the construction, erection, alteration, or reparation of such building, canal, turnpike, railroad, or other improvement, and for the materials used in the construction, erection, alteration, or reparation thereof, which have been furnished by any person."

The statute for mechanics' liens must be strictly construed as it is in derogation of the common law. Rhode Island Marble & Tile Co. v. Spear, 143 A. 777 (1928). Therefore, in order to perfect a mechanics' lien under the Rhode Island statute, a petitioner must closely follow the procedures set forth in G.L 1956 §§ 34-28-4 to -16. Significantly, there are two primary responsibilities of a potential lien holder. First, a person seeking to perfect a mechanics' lien must comply with the requirements of G.L 1956 § 34-28-4. In particular,

> "**Notice of intention to claim lien.** – (a) . . . the person shall, before or within one hundred and twenty (120) days after the doing of such work or the furnishing of such materials, mail . . . a notice of intention . . . to do work or furnish material, or both, together with a statement that the person so mailing may within one hundred and twenty (120) days after the doing of the work or the furnishing of the materials, file a copy of such notice of intention in the records of land evidence in the city or town in which the land generally described in such notice of intention is located and a further statement that the mailing of the notice of intention and the filing of the copy will perfect a lien of the person so mailing against the land under and subject to the provisions of this chapter, to the owner of record of the land at the time of the mailing, or, in the case of a lien against the interest of any lessee or tenant, to the lessee or tenant . . .."

G.L. 1956 § 34-28-4(a). This notice of intention must be executed under oath and contain: the name of the owner of record of the land at the time of the mailing; a general description of the land; a general description of the nature of the work done or to be done; the name and address of the person for whom work has been done or is to be done; the name and address of the person mailing the notice and the name and address of the person whose signature will bind the person so mailing on all matters pertaining to the notice or any lien claimed there under; and a statement that the person mailing the notice has not been paid for the work done or materials furnished. G.L. 1956 § 34-28-4(b)(1)-(6). A notice of intention filed under § 34-28-4 covers all work done or materials furnished, or both, and is effective for 120 days from the date of filing. G.L. 1956 § 34-28-9.

Should a dispute subsequently arise as to payment, or should any person performing work or providing materials as described in G.L. 1956 § 34-28-1, seek to enforce a properly-perfected mechanics' lien under the statute, a petition to enforce lien must be filed in accordance with G.L. 1956 § 34-28-10.

> "**Petition to enforce lien- Lis pendens notice.-** (a) . . . the person [claiming a lien] shall file a petition to enforce the lien . . . in the superior court for the county in which is situated the land upon which the building, canal, turnpike, railroad, or other improvement is being or has been constructed, erected, altered, or repaired . . . and . . . such person shall also file in the records of land evidence in the city or town in which the land is located a notice of lis pendens . . . the petition to be filed on the same day as the notice of lis pendens, or within seven (7) days thereafter, and both the petition and the notice of lis pendens to be filed within one hundred twenty (120) days of the date of the recording of the notice of intention . . .."

G.L. 1956 § 34-28-10(a). The notice of lis pendens shall state that the person filing the notice that day has filed or will file within seven days in the superior court a petition to enforce mechanics' lien. G.L. 1956 § 34-28-11(a). The notice shall also contain: the name of the person against whom the petition has been or will be filed and the relationship of the person to the land upon which the building or other improvement is being or has been constructed; a description of the land; the amount claimed in the petition to be due to the petitioner; the dates of the mailing and of the filing of any notice of intention and the name and address of the person to whom any mailing was made; and the name and address of the petitioner and of his or her attorney, if any. G.L. 1956 § 34-28-11(a).

Absent in this statutory scheme is any provision for a hearing either before or immediately after the filing of the lien. Rather, the property owner who wishes to remove the lien is given the option of either filing a bond or depositing sufficient cash to cover the amount of the lien with the superior court. G.L 1956 § 34-28-17.

> "**Dismissal of petition, notice of lien, and release of lien upon deposit in court.**- At any time after the recording of a notice of intention or after the filing of a petition to enforce a lien . . . the owner . . . of the land described in the notice or petition may pay into the registry of the court in the county in which the land is located cash equal to the total amount of the notice of intention and the accounts and demands of all persons claiming liens therein . . . including costs of the lien holder, or may, in lieu of cash, deposit in the registry of the court the bond of a surety company . . . in the total amount running to all persons claiming liens . . . and on proper payment or deposit and on motion of the owner . . . any justice of the superior court shall enter ex parte an order discharging the notice of intention and lis pendens and dismissing the cause as to the owner . . .."

G.L 1956 § 34-28-17.

Considering the various sections of the Mechanics' Lien statute together, one reality emerges. According to the language of G.L 1956 § 34-28-1(a), upon the recording of a notice of intention, the land and improvements of the property owner is made immediately liable and "subject to liens for all work done" by a lienor. G.L 1956 § 34-28-1(a). The remedy, then, for a property owner who wishes to remove the lien is to file a bond or deposit sufficient cash to cover the lien with the superior court. G.L 1956 § 34-28-17. There is no provision in the statute for a hearing to determine the validity of the lien or the claim underlying the lien until some point after the filing of the petition to enforce the mechanics' lien.

**Recent Developments in Lien Law in Rhode Island**

Beginning in 1969 and continuing through 1991, the United States Supreme Court addressed challenges to the taking of various property interests of individuals without affording an adequate right to hearing. (Resp.'s Mem. of Law at 9). As the relationship between lien law and constitutional due process developed on the Supreme Court level, the United States District Court for the District of Rhode Island, the First Circuit Court of Appeals and the Rhode Island Supreme Court responded to due process challenges in a similar vein.

The year 1969 marks the inception of the evolution. In that year the United States Supreme Court struck down a Wisconsin statute that permitted a creditor to effect prejudgment garnishment of wages without notice and prior hearing to the wage earner. Sniadach v. Family Finance Corp. of Bay View, 395 U.S. 337 (1969). In Sniadach, the Court held that "Where the taking of one's property is so obvious, it needs no extended

argument to conclude that absent notice and prior hearing this prejudgment garnishment procedure violates the fundamental principles of due process." Id. at 342. As the Court explained, "[t]he result is that prejudgment garnishment of the Wisconsin type may as a practical matter drive a wageearning family to the wall." Id. at 341-342.

While Sniadach may have been an obvious decision for the Court, since it concerned a family being deprived of wages, a more difficult and perhaps more significant case confronted the Court three years later. In 1972, the United States Supreme Court struck down Florida and Pennsylvania prejudgment replevin statutes that permitted vendors to have goods seized through ex parte application to a court clerk and the posting of a bond. Fuentes v. Shevin, 407 U.S. 67 (1972). In Fuentes, the Court held that the prejudgment replevin provisions "work a deprivation of property without due process of law insofar as they deny the right to a prior opportunity to be heard before chattels are taken from their possessor." Id. at 96. In writing for the Court, Justice Stewart explained that

> "The constitutional right to be heard is a basic aspect of the duty of government to follow a fair process of decisionmaking when it acts to deprive a person of his possessions. The purpose of this requirement is not only to ensure abstract fair play to the individual. Its purpose, more particularly, is to protect his use and possession of property from arbitrary encroachment – to minimize substantively unfair or mistaken deprivations of property, a danger that is especially great when the State seizes goods simply upon the application of and for the benefit of a private party. So viewed, the prohibition against the deprivation of property without due process of law reflects the high value, embedded in our constitutional and political history, that we place on a person's right to enjoy what is his, free of governmental interference."

Id. at 80-81. The Fuentes Court was particularly concerned with the necessity to prov an opportunity for a hearing at a 'meaningful time.' Id. at 80. As the Court articulat rather simply, "If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented." Id. at 81. In Fuentes, the Petitioners seeking to enforce the statute endeavored to support its constitutionality by relying on the purported 'safeguards' in the statutes. Id. at 83. Specifically, the statutes require that a party seeking a writ must first post a bond, allege conclusorily that he is entitled to specific goods, and open himself up to possible liability in damages if he is wrong. Id. Rejecting that proposition, the Court pointed out that those requirements "test no more than the strength of the applicant's own belief in his rights. Since his private gain is at stake, the danger is all too great that his confidence in his cause will be misplaced . . . . Because of the understandable, self-interested fallibility of litigants, a court does not decide a dispute until it has had an opportunity to hear both sides." Id. In sum, the Fuentes Court concluded that the bond requirement is no replacement for the right to a prior hearing. Id.

In response to the landmark ruling in Fuentes, the United States District Court for the District of Rhode Island (District Court) summarily declared the Rhode Island prejudgment attachment procedure pursuant to G.L. 1956 § 10-5-1 *et seq.* unconstitutional. McClellan v. Commercial Credit Corp., 350 F.Supp. 1013 (D. R.I. 1972). In McClellan, the District Court recognized that the Rhode Island attachment statute did not require judicial notice or judicial hearing prior to issuance of the writ or seizure of property of the defendant. Id. at 1014. In fact, under the then-existing statutory scheme, a person wishing to attach property of another need only have an

attorney fill out a form writ, execute an affidavit, and deliver them with a summons and complaint to a sheriff for service. Id. In light of Fuentes, the McClellan Court concluded that "[i]t is patent that the pre-judgment attachment procedures employed in Rhode Island pursuant to Title 10, Chapter 5, R.I.G.L. are unconstitutional." Id. at 1014.

The response to McClellan by the Rhode Island court system was swift. That same year, the Rhode Island Superior Court adopted, with the approval of the Rhode Island Supreme Court, an amendment to Rule 4(j) of the Superior Court Rules of Civil Procedure. The result was that the amended "Rule 4(j) placed a greater burden on a party seeking to attach property. The moving party must demonstrate at a hearing that the party has a likelihood of success on the merits. In addition, the moving party must demonstrate the need for security." Martin v. Lincoln Bar, Inc., 622 A.2d 464 (R.I. 1993). The amendment reads in pertinent part:

> "*Attachment and Trustee Process*.
> (3) *Same: Issuance*. The writ of attachment may be procured in blank from the clerk, shall be filled out by the plaintiff's attorney as provided in paragraph (2) of this subdivision, and shall be submitted to the court with a motion for its issuance. The motion shall be granted only upon a showing that there is a probability of a judgment being rendered in favor of the plaintiff and that there is a need for furnishing the plaintiff security in the amount sought for satisfaction of such judgment, together with interests and costs. A motion hereunder shall not be granted ex parte. Security may be required in connection with issuance of any writ of attachment. A surety upon a bond or undertaking hereunder shall be subject to the provisions of Rule 65(c)."[5]

Super. R. Civ. P. 4(j).

[5] The 1995 amendment to Rule 4 resulted in the relettering of several sections, including (j). The 1972 version of 4(j) is now lettered Super. R. Civ. P. 4(m)(3). The language has not been altered.

The following year, in order to correct the constitutional violations that moved the McClellan Court to strike down the pre-judgment attachment procedures, the Rhode Island General Assembly amended the attachment statute, G.L. 1956 § 10-5-2. This amendment added a procedure to ensure that defendants received advance notice and a hearing before a court allowed a plaintiff to attach a defendant's property. Specifically, the statute was revised to include the language:

> "At the time of the commencement of the action, or at any time thereafter, a plaintiff must file a motion in said court for authority to attach said defendant's assets including his personal or real estate, and the said motion must state the day, time and place of hearing and a copy must be served by the process server on the defendant or be leaving it at his last and usual place of abode with some person there at least five (5) days before the fixed date of hearing."[6]

G.L. 1956 § 10-5-2. Consequently, by 1973, both the Rhode Island statutory scheme, as well as the Superior Court Rules of Civil Procedure, had responded to the holding of Fuentes, and the mandate of McClellan. These responses recognized that constitutional due process requires an opportunity to be heard before property interests can be interfered with by the mechanism of a writ of attachment.

The next year, in 1974, the United States Supreme Court again dealt with a challenge to an alleged violation of due process in the interference with property rights without proper hearing. Mitchell v. W.T. Grant Co., 416 U.S. 600 (1974). In Mitchell, the Court upheld a Louisiana ex parte procedure allowing a lien holder to have disputed goods sequestered. Id. While declining to find a due process violation this time, the Mitchell Court engaged in a thorough analysis, distinguishing the Lousiana statute from

---

[6] G.L. 1956 § 10-5-2 was amended again in 1984, P.L. 1984, ch. 354, § 2, and again in 1986, P.L. 1986, ch. 320, § 1. Minor alterations were made which are not relevant to this Decision.

those at issue in Fuentes. Id. In particular, the Mitchell Court explained, "Under Louisiana procedure . . . the debtor . . . was not left in limbo to await a hearing that might or might not 'eventually' occur, as the debtors were under the statutory schemes before the Court in Fuentes. Louisiana law expressly provides for an immediate hearing and dissolution of the writ 'unless the plaintiff proves the grounds upon which the writ was issued.'" Id. at 618. Relying then, on the safeguards of an immediate hearing or subsequent dissolution of the writ, the Mitchell Court was satisfied that the requirements of due process were satisfied.

Soon thereafter, in 1975, the United States Supreme Court expounded further on its decision in Mitchell, emphasizing again the safeguards in Mitchell that satisfied due process. North Georgia Finishing, Inc., v. Di-Chem, Inc. 419 U.S. 601 (1975). In North Georgia Finishing, the Court invalidated an ex parte garnishment statute that failed to provide any of the Mitchell due process safeguards. Id. Specifically, the Court found that the Georgia statute failed to provide for notice and prior hearing, failed to require a bond, failed to require a detailed affidavit setting out the claim, failed to require a determination by a neutral magistrate, and failed to provide a prompt post-deprivation hearing. Id. at 606-608. In noting the contrast with the procedures in Mitchell, the Court explained, "[t]he Georgia garnishment statute has none of the saving characteristics of the Louisiana statute." Id. at 607. The North Georgia Finishing Court, in striking down the statute, found that even a temporary interference with property interests, without proper safeguards, violates due process. Id. at 606. "That the debtor was deprived of only the use and possession of the property, and perhaps only temporarily, did not put the seizure ɔnd the scrutiny under the Due Process Clause." Id.

During the 1970's, while the United States Supreme Court w addressing due process challenges to property interests that had beei sequestered, courts around the country were addressing due process cha property interests subject to mechanics' liens. In dealing with these challeng ..ts were divided as to whether or not the taking by a mechanics' lien is a significant property interest in violation of the Fourteenth Amendment. Several courts found that there was, in fact, a significant property interest. See Roundhouse Construction Corporation v. Telesco Masons Supplies Company, Inc., 362 A.2d 778 (Conn. 1975); Barry Properties, Inc. v. The Fick Brothers Roofing Company, 353 A.2d 222 (Md. Ct. of App. 1976). Other courts failed to find a significant property interest that would trigger the protections of the Due Process Clause. See Cook v. Carlson, 364 F. Supp. 24 (D. SD. 1973); Speilman-Fond, Inc. v. Hanson's, Inc., 379 F. Supp. 997 (D. Ariz. 1973) (three judge panel), aff'd mem., 417 U.S. 901 (1974).

In 1991, the United States Supreme Court addressed the issue concerning "unseized" property, announcing that the property interests that attachment affects are significant, and "even the temporary or partial impairments to property rights that attachments, liens, and similar encumbrances entail are sufficient to merit due process protection." Connecticut v. Doehr, 501 U.S. 1 (1991). Cognizant of its 1972 Fuentes opinion, finding a significant property interest in property seized by prejudgment replevin statutes, the Doehr Court expanded this ruling to find a significant property interest in property attached by a prejudgment attachment statute. Id. "For a property owner like Doehr, attachment ordinarily clouds title; impairs the ability to sell or otherwise alienate the property; taints any credit rating; reduces the chance of obtaining a home equity loan

or additional mortgage; and can even place an existing mortgage in technical default where there is an insecurity clause." Id. at 11. The Doehr Court made explicit that "[w]ithout doubt, state procedures for creating and enforcing attachments, as with liens, 'are subject to the strictures of due process' *Peraulta v. Heights Medical Center, Inc.*, 495 U.S. 80, 85, 108 S.Ct. 896, 899, 99 L.Ed. 2d 75 (1988)." Id. at 12. In Doehr, the Court also went out of its way to explain its summary affirmation of the Speilman-Fond decision, which failed to find a significant property interest at issue. Id. Specifically, the Court clarified,

> "Our summary affirmance in Speilman-Fond (citation omitted) does not control. In Speilman-Fond, the District Court held that the filing of a mechanics' lien did not amount to the taking of a significant property interest. (citation omitted) A summary disposition does not enjoy the full precedential value of a case argued on the merits and disposed of by a written opinion. (citation omitted) The facts of Speilman-Fond presented an alternative basis for affirmance in any event. Unlike the case before us, the mechanics' lien statute in Speilman-Fond required the creditor to have a pre-existing interest in the property at issue. 379 F. Supp. at 997. As we explain below, a heightened plaintiff interest in certain circumstances can provide a ground for upholding procedures that are otherwise suspect." (citation omitted)

Id. Having found that a significant property interest was at issue, the Doehr Court went on to decide that the risk of deprivation that the State permits is too great. Id. "The potential for unwarranted attachment in these situations is self-evident and too great to satisfy the requirements of due process absent any countervailing consideration." Id. at 14. Furthermore, the Court concluded that "absent such allegations [of an attempt to transfer or encumber real estate] . . . the plaintiff's interest in attaching the property does

not justify the burdening of Doehr's ownership rights without a hearing to determine the likelihood of recovery." Id. at 16.

Later that same year, the Court of Appeals for the First Circuit paid homage to the holding in Doehr, and struck down a statutory lien imposed by the Environmental Protection Agency pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). Reardon v. U.S, 947 F.2d 1509 (1st Cir. 1991). In Reardon, the court held that the lien statute at issue denies due process by failing to provide for notice and predeprivation hearing. Id. The Reardon Court concluded that "the lien on real property created in 42 U.S.C. § 9607(l) amounts to deprivation of a 'significant property interest' within the meaning of the due process clause." Id. at 1518. In overruling the decision of the District Court, the Court of Appeals noted that

> "[t]he District Court, relying primarily on *Speilman-Fond* (citation omitted) found that the filing of a federal lien under 42 U.S.C. § 9607(l) did not amount to a deprivation of a significant property interest; thus, the court did not reach the second step of the analysis. However, a Supreme Court case decided after the district court had issued its decision . . . has clarified the law in this area considerably, and has precluded continued reliance on the Court's summary affirmance in *Speilman-Fond.*"

Id.

Most recently, in 1994, the Rhode Island Supreme Court struck down a section of the Rhode Island statute dealing with writs of attachment. Shawmut Bank of Rhode Island v. Costello, 643 A.2d 194 (R.I. 1994). This statute was originally declared unconstitutional by the District Court in 1972. McClellan v. Commercial Credit Corp., 350 F.Supp. 1013 (D. R.I. 1972). As discussed previously, G.L. 1956 § 10-5-2 and

Super. R. Civ. P. 4(j) were both amended in response to the District Court ruling in McClellan. However, until 1994, G.L. 1956 § 10-5-5 remained unchanged. The Shawmut Bank Court traced the history of property law and due process, and took into account the holdings of Fuentes and Doehr in declaring G.L. 1956 § 10-5-5 unconstitutional. Shawmut Bank of Rhode Island v. Costello, 643 A.2d 194 (R.I. 1994). In Shawmut Bank, the Court held that the property interest at stake is significant, that the risk of erroneous deprivation permitted by the statute is substantial, and that any burdens that an additional procedural requirement would entail would be minimal. Id. at 199-202.

Against the backdrop of this evolving status of lien law, the Respondents in the instant matter urge this Court to find that the Rhode Island Mechanics' Lien statute is violative of due process and therefore unconstitutional.

**The Property Interest at Issue**

The threshold inquiry in a due process challenge to statutes that involve property rather than liberty interests is "whether the statute authorizes the taking of a 'significant property interest' protected by the fifth amendment." Reardon v. U.S, 947 F.2d 1509, 1517 (1st Cir. 1991). The Respondents argue that this issue has been settled by the holdings in Doehr and Reardon. In particular, the Respondents contend that the mechanics' lien filed in the instant matter has had the very effect about which the Courts in Doehr and Reardon were concerned. Specifically, the Respondents assert that the lien in the matter at hand has prevented the Respondents from the use and control of more than $166,264.66 in order to preclude defaulting on certain loan provisions relating to the mortgage on the property. Accordingly, Respondents argue, a significant property

interest has been implicated, without any of the protections required by the Due Process Clause.

The Petitioners, on the other hand, argue that the mechanics lien does not deprive a person of a significant property interest. In support of this position, the Attorney General advances an argument relying primarily on cases that preceded the holding in Doehr. In particular, the Attorney General asks this Court to rely on Speilman-Fond, which failed to find a significant property interest implicated by a mechanics' lien statute. In addition, the Attorney General asks this Court to rely on an Indiana Court of Appeals case which was decided four years after Doehr. Haimbaugh Landscaping, Inc. v. Jegen, 653 N.E.2d 95 (Ind. App. Ct. 1995). In Haimbaugh, the court examined a mechanics' lien statute and failed to find a significant property interest implicated. Id. The Petitioners, adopting the position of the Attorney General, maintain that since no significant property interest is implicated in the filing of a mechanics' lien, the due process inquiry is over and the statute passes constitutional muster.

This Court finds that post-Doehr, there is no longer any valid argument that a mechanics' lien does not implicate a significant property interest. To begin with, this Court finds that reliance on Speilman-Fond is misplaced. As the Court of Appeals in Reardon warned, Doehr has "precluded continued reliance on the Court's summary affirmance in Speilman-Fond." Reardon v. U.S., 947 F.2d 1509, 1517 (1st Cir. 1991). This Court finds that reliance on Haimbaugh is also misplaced. In this connection, this Court notes that the case is not controlling legal authority, having been decided by an appeals court in Indiana. Moreover, this Court agrees with the Respondents that Haimbaugh may have been decided differently, had the facts in the instant matter been

before the Haimbaugh Court. Specifically, if instead of the "hypothetical injury" contemplated in Haimbaugh, that court had before it the actual injury of the Respondents in the instant matter, the outcome may have been different. In any event, the Haimbaugh Court failed to properly apply the holding of Doehr, instead drawing what this Court considers to be a fictional distinction between attachments and liens.

On the contrary, the United States Supreme Court, in its thorough analysis of the due process challenge to the attachment procedure in Doehr, concluded that interferences with property interests, including "liens" implicate a significant property interest. Connecticut v. Doehr, 501 U.S. 1, 12 (1991). While the statute in Doehr dealt with prejudgment attachment of real estate, rather than a mechanics' lien, the Doehr Court was principally concerned with the effects of the procedure: clouding title; impairment of the ability to sell or otherwise alienate the property; tainting a credit rating; reducing the chance of obtaining a home equity loan or additional mortgage; and placing an existing mortgage in technical default where there is an insecurity clause. Id. at 12. Taking these possible consequences into consideration, the Doehr Court concluded that the attachment proceeding that allowed for these consequences implicated a significant property interest. Id. Similarly, upon the filing of a notice of intention in a mechanics' lien case, the very same consequences may flow. Surely then, if the Doehr Court was concerned about particular consequences in an attachment procedure, it defies logic to suggest that the Supreme Court would not be equally concerned if the same consequences were to flow from a mechanics' lien. Furthermore, notwithstanding the fact that the statute at issue in Doehr concerned an attachment procedure, the Court went out of its way to include liens within its discussion. Id. Specifically, the Court stated that "even the temporary or

partial impairments to property rights that attachments, liens, and similar encumbrances entail are sufficient to merit due process protection." Id. Given the similarities between attachment procedures and mechanics' liens, as well as the similar ensuing effects therefrom, and recognizing that the Doehr Court saw fit to include liens within its reach, this Court finds that the Rhode Island Mechanics' Liens statute implicates a significant property interest.

**The Process Due**

Once a statute has been found to authorize the taking of a significant property interest protected by the Fifth Amendment, the analysis turns to examine what process is due in the particular circumstances. Reardon v. U.S, 947 F.2d 1509, 1517 (1st Cir. 1991). The United States Supreme Court, in 1976, set forth a threefold inquiry to determine how much process should be afforded a property owner prior to or after a deprivation. Matthews v. Eldridge, 424 U.S. 319 (1976). The Matthews test requires a court to balance three factors. Id. More recently, the Doehr Court reaffirmed the Matthews inquiry, explaining that the relevant inquiry under Matthews requires:

> "first, consideration of the private interest that will be affected by the prejudgment measure; second, an examination of the risk of erroneous deprivation through the procedures under attack and the probable value of additional or alternative safeguards; and third, in contrast to Matthews, principal attention to the interest of the party seeking the prejudgment remedy, with, nonetheless, due regard for any ancillary interest the government may have in providing the procedure or forgoing the added burden of providing greater protections."

Connecticut v. Doehr, 501 U.S. 1 (1991). The Doehr version of the Matthews t

the third prong "to include an analysis of a private party's interest in the reme

private party as opposed to the government is acting to effect a deprivation." Shawmut Bank of Rhode Island v. Costello, 643 A.2d 194 (R.I. 1994).

As to the first prong of the test, the Respondents aver that the private interest affected by a mechanics' lien is the right to utilize the financial benefits of owning real estate. Moreover, the Respondents explain, a mechanics' lien deprives a property owner from the opportunity to take economic advantage of the equity in a property. The Respondents also specify that in the instant matter, the private interest affected is the money currently in the registry of the court.

The Petitioners, on the other hand, contend that because the owner of the property remains in full possession of the subject property, that the property right affected is a very narrow one. In fact, argue the Petitioners, the private interest at stake must be minimal, since there is no physical deprivation of property. The Attorney General shares the view of the Petitioners that the affected private interest is minimal, supporting his position with the previous argument that the interest is not "significant" in the context of a due process challenge.

Taking into consideration the principles articulated in holding that a mechanics' lien implicates a significant property interest; this Court finds that the private interest affected by the mechanics' lien is likewise of considerable importance. Under the Mechanics' Liens statute, upon the recording of a notice of intention, the owner of the subject property suffers both immediate as well as potential consequences. First, the landowner is immediately deprived of clear title to land. In addition, the owner's credit rating is likely to be tainted. Moreover, an existing mortgage could technically be in default in the event of an insecurity clause. Furthermore, should the property owner

endeavor to sell or otherwise alienate the property, for example, by obtaining (further) financing secured by a mortgage or an additional mortgage, such owner may find this task difficult, or indeed impossible, with a lien against the subject property. Finally, with all of these consequences looming, the property owner may elect to rid the property of the lien. Unfortunately for the property owner, before this feat may be accomplished, the Mechanics' Liens statute works another deprivation. To free the property from a mechanic's lien, the property owner must either purchase and file a bond or deposit sufficient cash to cover the amount of the lien with the registry of the court, as was done in the case at bar. Accordingly, this Court finds that the private interest implicated by the mechanics' lien is of tremendous significance. Moreover, this Court rejects the argument advanced by the Petitioners which suggests that in order for a private interest to be significant, that property must be seized. The United States Supreme Court rejected that argument in 1991 in Doehr, and this Court likewise finds no merit in the argument twelve years later.

As to the second prong of the Matthews test, the Respondents argue that the risk of erroneous deprivation under the Mechanics' Liens statute is high. In support of this assertion, the Respondents point out that the person or entity claiming a lien is under no requirement to at least show a reasonable likelihood that the underlying debt is due or valid. In fact, the Respondents contend, the only threshold fact required to impose the lien is that work, services or material were supplied. Further, the Respondents maintain that under the existing infirm statutory procedure, no judicial determination must be made at the outset concerning these threshold facts. Finally, argue the Respondents, under the statute, there is no right to any pre- or post-deprivation hearing to determine the

validity and enforceability of the underlying debt. Therefore, urge the Respondents, not only is the risk of error high, but there are no corrective mechanisms available to the property owner.

The Petitioners, on the other hand, contend that the risk of an erroneous deprivation is substantially limited by the statutory requirement of the statement under oath. The Petitioners contend that the penalties of perjury prevent the danger of any false or incorrect statement being offered in support of a mechanics' lien. Likewise, the Attorney General pays great heed to the purported safeguards in the statute. For example, the Attorney General suggests that the mere fact that in order to perfect a mechanics' lien, the claimant must file a notice within 120 days of performing the work constitutes a safeguard. In addition, the Attorney General suggests the option of the property owner to purchase a bond or deposit sufficient cash into the registry of the court as a surefire safeguard. Finally, and most importantly according to the Attorney General, the statute provides that the respondent "may contest the right of the petitioner . . . claiming the lien." (Attorney General's Amicus Curiae Mem. of Law at 17).

This Court finds that the risk of erroneous deprivation permitted by the Mechanics' Liens statute is substantial. To begin with, the statute allows any person seeking to perfect a lien, to record a notice of intention containing a sworn statement of the amount allegedly owed. Under the statute, the "due process" afforded the property owner consists of no more than the recording of the sworn statement. Once the notice has been recorded, the lien is perfected and the negative repercussions to the property owner begin to flow. These repercussions flow regardless of the truth, accuracy or validity of the claimed amounts due under the lien. These repercussions flow before any

judicial determination has been made as to the validity of the lien. In fact, these repercussions flow before any judge of any court has ever seen the notice of intention. And, most significantly, these repercussions flow before the property owner has any opportunity whatsoever to challenge the truth, accuracy, or validity of the amounts claimed under the lien. Instead, the property owner must suffer the consequences based on a claimant's bald assertions until the property owner either makes the payment in full, purchases a bond, deposits sufficient cash to cover the claim in the registry of the court, or hires an attorney to contest the claim at some later, unspecified time. In fact, from the time that a notice of intention is recorded, a person seeking to enforce a lien has a statutorily-granted 120 day period within which a petition to enforce must be filed. Thus, a potential claimant may wait four months from the time of recording the notice of intention before an enforcement action is commenced. But the wait for the property owner seeking to contest the lien is not over even at this point. Rather, it is up to the property owner to file an objection to the enforcement action with the court and to seek a hearing date at some point thereon. The statute does not provide for any immediate hearing, nor does the statute provide for any time period within which a hearing must take place. In the meantime, the untested lien remains on the owner's property. Until one of these further deprivations is elected, the property owner suffers from all of the financial problems associated with property subject to a lien.

This Court finds that the "safeguards" held up by the Petitioners as a bulwark against any potential injustice range from mere formality to further injury to the property owner. First, the notion that the penalty of perjury is any safeguard to a disputed money claim fails to persuade this Court. The suggestion that because the singular document

required to be filed must be sworn will somehow prevent any deliberate or innocent errors is beyond credulity. Furthermore, the argument that an additional safeguard lies in the provision that the respondent may contest any claim is also without merit. *When* this opportunity arises is not made clear by the statute. However, what *is* clear is that any such opportunity comes *after* the imposition of the lien. In the meantime, the property owner is deprived of all that is associated with clear title to her property. Moreover, this opportunity must be initiated by the property owner. The statute does not provide for any immediate post-deprivation hearing. Consequently, any such "safeguards" are too little and too late to satisfy the requirements of due process.

In striking down the attachment statute, the Rhode Island Supreme Court concluded, "Section 10-5-5 provides less protection against erroneous deprivation than the protections noted and upheld in Mitchell and the minimal protections struck down in Doehr. Consequently the practice of an ex parte proceeding under § 10-5-5 poses an unacceptable peril of error." Shawmut Bank of Rhode Island v. Costello, 643 A.2d 194 (R.I. 1994). Likewise, this Court finds that the Mechanics' Liens statute provides less protection against erroneous deprivation than the protections noted and upheld in Mitchell and the minimal protections struck down in Doehr. Accordingly, ex parte proceedings under the Mechanics' Liens statute pose an unacceptable peril of error. Moreover, this Court finds that the probable value in additional or alternative safeguards is considerable.

The final prong of the Matthews test requires this Court to examine the interest of the private party in the ex parte procedure, together with the government's interest in forgoing the added burden of requiring greater protections. The Respondents argue that

the cost or burden to government in providing the property owner an opportunity to be heard is outweighed by the benefits that are required under the Fourteenth Amendment.

The Petitioners, on the other hand, argue that a requirement that a formal hearing be held in superior court before a mechanics' lien could issue would place an undue burden on the courts of the state. Concerned about potentially "tying up substantial Court time and resources," the Petitioners paint a picture of untold numbers of builders and contractors banging on the courthouse doors. (Pet.'s Mem. of Law at 9). The Petitioners also suggest that any judicial inquiry at such a proposed initial hearing would not be any more "in depth" than that contemplated by the statute. (Pet.'s Mem. of Law at 9). The Attorney General, in his argument, focuses primarily on the interest of the lien holder to secure payment for his labor and materials.

This Court finds that the Mechanics' Liens statute is so lacking in minimal constitutional protections that the potential governmental burden that an additional procedural requirement would entail is far outweighed by the benefits incident to the fundamental principles of due process. This Court also finds that while a potential claimant certainly has an interest in getting paid; that claimant, like all others, can suffer through the constitutionally-required exercise of a hearing prior to depriving the property owner of the process which is due.

**Conclusion**

After due consideration of the arguments advanced by counsel at oral argument and in their memoranda, this Court finds that the Mechanics' Liens Law, found in Chapter 28 of Title 34 of the General Laws of Rhode Island, is unconstitutional beyond a reasonable doubt. This statute fails to provide the procedural due process rights required

by the Fourteenth Amendment to the United States Constitution and by Article 1, Section 2 of the Rhode Island Constitution.

Prevailing counsel shall present an appropriate order and judgment reflecting the foregoing, which, inter alia, should include a stay of the effect of the judgment for 30 days. Said order and judgment to be presented to the Court not later than April 30, 2003.

3

STATE OF RHODE ISLAND
PROVIDENCE, SC

SUPERIOR COURT

GEM PLUMBING AND HEATING CO., INC :
:
V : P.M. NO. 02-2778
:
ROBERT V ROSSI and LINDA A ROSSI :

**AFFIDAVIT**

I, Clinton L. Poole, after first being duly sworn depose and say:

1. I have personal knowledge of the facts setforth.

2. I am an attorney admitted to practice law in the state of Rhode Island.

3. I was retained by Robert V. Rossi and Linda A. Rossi to represent them in the closing of two loans from First Trade Union Bank (First Trade), the first loan in the sum of $733,000.00 the second loan in sum of $586,126.00. I was also retained to represent the Rossi's in a closing of a loan from Ocean State Business Development Authority (OSBDA). The OSBDA loan that would subsequently pay off the second loan from First Trade. The loan from OSBDA was to be issued through a debenture guarantee under the Small Business Administration's SBA 504 loan program subsequent to the closing of the First Trade loans.

4. Both First Trade and OSBDA and Robert and Linda Rossi entered into an Intercreditor Agreement dated April 26, 2002 setting out OSBDA's obligation to pay off the second loan to First Trade.

5. The loans from First Trade and OSBDA were to refinance a construction loan secured by a mortgage on the real estate located at 28 Thurber Blvd., Smithfield, Rhode Island (Thurber property).

6. As a part of the conditions of the loans it was required that First Trade and OSBDA each be conveyed a mortgage interest in the Thurber property. The mortgages were required to be in first and second positions respectively, subject to no liens or attachments. A policy of title insurance insuring such positions on the title was required to be issued to each mortgagee. Accordingly it was absolutely required by First Trade and OSBDA that any and all attachments and liens including mechanics' liens be released. Attached to this affidavit as Exhibit A is a copy of the Escrow Agreement.

7. I conducted a title search on the Thurber property and found recorded against the title, a mechanics lien notice from Sells/Greene Building Company dated October 26, 2001 and recorded October 29, 2001 and an amended mechanics lien notice dated November 9, 2001 and recorded November 14, 2001. I also found recorded against the title a mechanics lien notice from Gem Plumbing and Heating Company, Inc. which was dated January 28, 2002 and recorded January 28, 2002. Attached to this Affidavit as Exhibit B is a copy of my Report on Title Examination dated April 18, 2002.

8. First Trade and OSBDA had knowledge of these mechanics liens. First Trade agreed to proceed with the closing of both mortgage loans subject to the condition of holding the sum of $170,000.00 in escrow for the discharge of the mechanics' liens pursuant to R.I. Gen. Laws §34-28-17. The issuance of the OSBDA debenture would be held pending the actual discharge of the mechanics' liens.

9. The closing for the First Trade loans occurred April 26, 2002. Attached to this affidavit as Exhibit C is a copy of the closing Settlement Statement.

10. On June 3, 2002 the sums required to discharge the liens were paid into the Registry of the Superior Court for Providence and Bristol Counties. Thereafter an Order was signed by Mr. Justice Silverstein releasing and discharging the said mechanics liens. Those releases were then recorded in the Land Evidence Records for the town of Smithfield on June 4, 2002.

11. OSBDA then proceeded with the debenture and issued the sum of $586,126 to First Trade to pay off First Trade's second loan to the Rossi's.

Clinton L. Poole, Esq.

Subscribed and sworn to before me this 20 day of December 2002

Notary Public
My Commission Expires: 4-20-05
Ronald A. Moran

# ESCROW AGREEMENT

This Agreement is made this 26th day of April, 2002, by and among **Robert V. Rossi and Linda A. Rossi,** with a mailing address of 17 Indigo Farm Road, Harrisville, Rhode Island 02830 (the "Borrower"), **First Trade Union Bank,** a federal savings bank organized under the laws of the United States of America, having a place of business at 25 Drydock Avenue, Boston, Massachusetts 02205 (the "Bank"), **Ocean State Business Development Authority, Inc.**, with a place of business located at 155 South Main Street, Providence, Rhode Island ("OSBDA") and Roberts, Carroll, Feldstein & Peirce, Incorporated of 10 Weybosset Street, Providence, Rhode Island ("RCF&P").

## PURPOSE

The Bank has agreed to lend to the Borrower the sums of Seven Hundred Thirty-Three Thousand Dollars ($733,000) and Five Hundred Eighty-Six Thousand One Hundred Twenty-Nine Dollars ($586,129) (collectively, the "Bank Loans"). The Loans are to be evidenced by Promissory Notes of even date in the principal amounts of $733,000 and $586,129 (the "Bank Notes").

OSBDA has agreed to lend to the Borrower the aggregate sum of Six Hundred Five Thousand Dollars ($605,000) (the "OSBDA Loan") to, among other things, pay off the $586,129 Bank Loan. The OSBDA Loan is to be evidenced by a promissory note of even date in the principal amount of $605,000 (the "OSBDA Note").

The Bank Notes and the OSBDA Notes shall be secured by, among other things, a Mortgage and Security Agreement and Collateral Assignment of Leases and Rents on

EXHIBIT "A"

property located at 28 Thurber Boulevard, Smithfield, Rhode Island (the "Property"). The Bank Notes and the OSBDA Note are further guaranteed by The Rossi Law Offices, Ltd. The Mortgage and Security Agreement, Collateral Assignment of Leases and Rents, Guaranty and other collateral documents, each of even date, shall hereinafter be referred to as the "Collateral Documents".

As a condition of the Bank's obligation to make the Bank Loans and OSBDA's obligation to make the OSBDA Loan, the Bank has required that the Borrower deposit certain sums with the Registry of the Providence County Superior Court (the "Court Registry") in such amounts as shall be deemed appropriate and ordered by such Court as indemnity and security for the payment, satisfaction, discharge or disposition of the two pending Mechanic's Liens filed against the Property, one by Sells/Greene Building Company, LLC in the amount of One Hundred Thirty Six Thousand Four Hundred Forty Seven and 11/100 Dollars ($136,447.11) dated February 26, 2002, and the other by Gem Plumbing & Heating Co., Inc., in the amount of Thirty-Five Thousand Five Hundred Dollars. ($35,500) dated January 28, 2002 (collectively, the "Mechanic's Liens"). The Borrower has agreed to honor this requirement by depositing the amount of $172,000 into the Court Registry or such amount as is ordered by the Court..

As a further condition of the Bank's obligation to make the Bank Loans and OSBDA's obligation to make the OSBDA Loan, the Bank and OSBDA have required that the Borrower deposit certain sums into an escrow account to be maintained and controlled by RCF&P for the purposes of establishing a reserve for the completion of the construction of the Property so that a permanent certificate of occupancy can be

received. The Borrower has agreed to honor this requirement by depositing the amount of $25,000 into the escrow account held by RCF&P.

**NOW THEREFORE,** in consideration of the terms and conditions herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged the parties hereto agree as follows:

1. The Borrower will deposit the amount of $172,000.00 or such amount as shall be ordered into the Court Registry. Title to the Property shall be free and clear of such Mechanic's Liens. The funds shall be held by RCF&P until it has received such court order.

2. The Borrower hereby designates RCF&P as escrow agent for the purpose of completion of construction as set forth herein and RCF&P agrees to such designation and assumes and accepts the obligations as contained herein. The Borrower has deposited an amount of $25,000 into the escrow account.

3. The funds in the escrow account shall be held in or disbursed from the escrow account only pursuant to the terms of this Agreement.

4. The Borrower hereby certifies that Exhibit A attached hereto contains a complete and accurate list of all construction to be done by and all sums due or to become due with respect to the construction of improvements on the Premises in order to obtain a permanent certificate of occupancy.

5. The Borrower agrees that it will cooperate with the Court Registry, the Bank and RCF&P and will execute and deliver, or cause to be executed and delivered, all such other instruments and documents, and will take all such other action as the Court

Registry, the Bank and RCF&P may reasonably request from time to time in order to carry out the provisions and purposes hereof.

6. As long as no event of default (as defined in the Bank Notes and OSBDA Note and the Collateral Documents) shall exist, RCF&P shall release funds from the escrow account as work is completed on the Property. As work is completed and an invoice for final payment is presented by the applicable contractor together with a lien release and/or letter indicating that payment of the applicable amount shall satisfy any and all obligations due to the contractor, RCF&P shall release to the Borrower such amount in the form of a check payable to the Borrower and the applicable contractor. If the Borrower does not complete such construction or their exists an event of default, the Bank and/or RCF&P shall have the right to disburse funds from the escrow account to complete construction and to obtain the permanent certificate of occupancy, but it shall not be obligated to do so.

7. This Agreement shall be governed by and construed in accordance with the laws of the State of Rhode Island. Whenever possible, each provision of this Agreement shall be construed so as to be valid under applicable law, but if any provision of this Agreement shall be held to be prohibited or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

8. This Agreement shall terminate upon termination of the Mechanic's Liens and the return to the Borrower of any remaining funds deposited into the Court Registry

and receipt of permanent certificate of occupancy together with all applicable lien releases.

9. Any notice or other communication required or desired to be served, given or delivered hereunder shall be given in writing and delivered personally or by facsimile transmission, telexed or mailed by registered or certified mail (return receipt requested) postage prepaid, to the parties at the addresses first set forth above (or at such other address for a party as shall be specified by like notice; provided that notices of a change of address shall be effective only upon receipt thereof).

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed on the date first above written.

**WITNESS:**

**BORROWER:**

**Robert V. Rossi**

**Linda A. Rossi**

**LENDER:**

**First Trade Union Bank**

By:

A. Michael Marques
Senior Vice President

# REPORT ON TITLE EXAMINATION
**TO: First Trade Union Bank, FSB**
**As of April 17, 2002**

**RE: Rossi Law Offices, Ltd**

**Property: 28 Thurber Boulevard, Smithfield, Rhode Island 02917**

Owners of Record: **Robert V. Rossi & Linda A. Rossi**

**Restrictions: Bk. 60 Pg. 131** **Easements: None**

**Agreements: Extension of Special Use Permit Bk. 262 Pg. 120** **Attachments: None**

**Mortgages: 1.) Mortgage to Soverign Bank dated 11/01/00 and recorded on 11/02/00 in Book 274 at Page 432 at 9:12 AM in the original amount of $550,000.00. 2.) Assignment of Rents and Leases dated 11/01/00 and recorded on 11/02/00 in Book 274 at Page 452 at 9:13 AM. 3.) Mortgage to Soverign Bank dated 11/01/00 and recorded on 11/02/00 in Book 274 at Page 461 at 9:14 AM in the original amount of $405,000.00. 4.) Assignment of Rents and Leases dated 11/01/00 and recorded on 11/02/00 in Book 274 at Page 481 at 9:15 AM. All of the foregoing shall be discharged at closing of the matter**

**Owner of Record as of Dec. 31st last: Same Assessor's Plat 46 Lot No. 259**

**Real Estate Taxes: MLC attached**

**Personal Property Taxes: MLC attached**

**Fire District Taxes: Not applicable to this transaction**

**Sewer Use: None**

**Assessments: None** **Water Bill: available at closing**

**Corporation Taxes: Certificates of Good Standing to be obtained prior to closing.**

**Defects and questions to be disposed of before closing: The following Notices of Intent were found on the property:**

**1.) Notice of Intent filed by Sells/Greene in Bk. 26L at Pg. 313 filed and recorded on 10/29/01 at 10:06 AM in the amount of $650,851;**

**2.) Amended Notice of Intent filed by Sells/Greene in Bk. 26L at Pg. 313 filed and recorded on 11/14/01 at 11:02 AM in the amount of $600,058.00;**

**3.) Notice of Intent filed by Gem Plumbing & Heating Co., Inc. filed and recorded on 01/28/02 at 2:09 PM in Bk. 26L at Pg. 341 in the amount of $35,500;**

**4.) Notice of Intent filed by Sells/Greene on 02/26/02 at 1:15 PM in Bk. 26L in the amount of $129,807.78;**

EXHIBIT "B"

**ALL OF THE ABOVE ARE TO BE DISCHARGED OR RELEASED PRIOR TO OR AT THE TIME OF CLOSING.**

**CHARGES AND FEES:**

| | | |
|---|---|---|
| **Recording Charges:** | **$** | **UNK** |
| **Mortgagee's Policy** | **$** | **1,529.40** |
| **Tax Certificate:** | **$** | **50.00** |
| **Document Preparation:** | **$** | **175.00** |
| **Title Search :** | **$** | **375.00** |
| **Closing Attendance:** | **$** | **150.00** |
| **TOTAL:** | **$** | **2,279.40** |

**Dated: April 18, 2002**

**Clinton L. Poole, Esquire**
**05-0369057**
**259 Wayland Avenue**
**Providence, RI 02906**

# SETTLEMENT SHEET

**Lender:**

First Trade Union Bank
14 Jefferson Park Road
Warwick, RI 02888

**Borrower:**

Robert V. Rossi and Linda A. Rossi
28 Thurber Blvd.
Smithfield, RI 02917

**Loan Amounts:**

$733,000 and $586,129 for a total of $1,319,129

**DISBURSEMENTS:**

| | | |
|---|---|---|
| 1. | Payoff of First Mortgage Loan to Sovereign Bank - | $169,326.85 |
| 2. | Payoff of Second Mortgage Loan to Sovereign Bank - | $537,734.44 |
| 3. | Payoff of Line of Credit Loan to Sovereign Bank - | $257,376.72 |
| 4. | Payoff of Second Mortgage Loan on Residence to Sovereign Bank- | $ 45,000.00 |
| 5. | Payoff of Third Mortgage Loan on Residence to Lender - | $ 50,159.18 |
| 6. | Payoff of Wells Fargo Line of Credit - | $ 75,000.00 |
| 7. | Payment to Registry of Court for Release of Mechanic's Liens - (escrowed by RCF&P) | $172,000.00 |
| 8. | Funds Escrowed by RCF&P for Completion of Construction - | $ 25,000.00 |
| 9. | Commitment Fee to Lender – | $ 7,330.00 |
| 10. | Appraisal Fee to Lender – $2,200 | (POC) |
| 11. | Tax Servicel Fee to Lender - | $ 112.00 |

EXHIBIT "C"

| | | |
|---|---|---|
| 12. | Flood Search Charges - | $ 22.00 |
| 13. | Legal Fees to RCF&P - | $ 2,800.00 |
| 14. | Legal Fees and Title Insurance Premium Fee to Clinton L. Poole (See Attached) | $ 5,799.40 |
| | TOTAL DISBURSEMENTS - | $1,347,660.59 |
| | BALANCE DUE BORROWER FROM LINE OF CREDIT - | $ 28,531.59 |

ACKNOWLEDGED AND AGREED:

______________________________
Robert V. Rossi

Linda A Rossi
______________________________
Linda A. Rossi

3294-24#1

STATE OF RHODE ISLAND
PROVIDENCE, SC

SUPERIOR COURT

"4"

GEM PLUMBING AND HEATING CO., INC :
V : P.M. NO. 02-2778
ROBERT V ROSSI and LINDA A ROSSI :

## AFFIDAVIT OF ROBERT V. ROSSI

I, Robert V. Rossi, After being first duly sworn depose and say:

1. I have personal knowledge of the facts stated in this affidavit.

2. During September 2001 I spoke to Leonard Gemma, President of Gem Plumbing and Heating Company, Inc. (Gem) concerning retaining Gem to install water and sewer lines at the new building project at 28 Thurber Blvd., Smithfield, RI. in accordance with plans prepared by my engineer.

3. There was no written contract to do the work.

4. I disputed the bill presented by Gem in that I believed it was too high for the work and services performed based on a previous proposal provided to Sells/Greene Building Company, LLC, the general contractor for the building. In addition work that was to be completed by Gem such as road repair was not done at all.

5. I had disputed the bill through my owners' representative but Gem refused to discuss the amount due. Instead Gem recorded a mechanics' lien. No itemization of the amount due was provided by Gem until months after the mechanics' lien was recorded.

6. Upon producing an itemization of the bill I noticed charges for repair of leaks to the water line including the re-excavation of the line. These charges stem exclusively from Gem's errors in installing the water line and are not our liability. Yet Gem has included these charges in its mechanics' lien.

7. The bill contains excessive hourly charges for workers and is excessive for their skill level and licensure.

8. The filing of the mechanics' lien also caused my wife and I to be in default of our Construction and Loan Agreement with Sovereign Bank.

9. At completion of the construction and disbursements under the then construction mortgage I was required to complete a second closing whereby Ocean State Business Development Authority (OSBDA) would pay off 50% of the Sovereign mortgage under a Small Business Administration 504 loan. OSBDA required a second position mortgage on the property subject to no liens.

10. As our construction project neared its end significant cost overruns were experienced necessitating a renegotiation of the total loan amount required. Ocean State Business Development Authority (OSBDA) expressed a willingness to provide more money on its 45% portion provided the bank would provide the remaining 50% portion. After reviewing proposals from various banks the best offer came from First Trade Union Bank (First Trade). First Trade offered my wife and I a complete refinancing package under the SBA 504 loan program that would payoff almost all our lines of credit and home equity mortgage which was used to cover the cost overruns. Additional money was also provided to help finance the build out cost of rental space at the lower level of the building. OSBDA also agreed to the larger loan package.

11. To complete this refinance and restructure of our entire debt on the subject property, title to the property had to be free and clear of any liens including the mechanics liens. I strongly believed that Gem's mechanics' lien was overstated and the money claimed not to be due for the reasons stated. However, having to close the refinancing package to maintain our financial integrity my wife and I had no alternative but to pay the amount of the Gem mechanics' lien in cash into the court. The source of this cash came from the refinance.

12. We did attempt to get a bond to discharge the mechanics' liens but upon investigation I was informed that a bond required 100% collateral plus a premium for the bond.

13. The face amount of the mechanics' lien plus costs was paid to the court and a discharge was issued and recorded on June 4, 2002. This action enabled us to complete the closing on the new financing package.

14. The mechanics' lien is for an amount we do not owe and my wife and I have incurred financial hardship as a direct result of being deprived of the use of money which

belongs to us and on which we have been paying interest. Our financial position has worsened and has limited us in further financing options and business opportunities.

14. Gem had refused to negotiate the bill but instead has relied solely on its mechanics' lien remedy. Yet it refused to provide documentation to back up its bill except under a recent order of this court.

Robert V. Rossi

Subscribed and sworn to before me this 24th Day of December 2002.

Notary Public
My Commission Expires: 3/12/05

115"

STATE OF RHODE ISLAND
PROVIDENCE, SC

SUPERIOR COURT

GEM PLUMBING AND HEATING CO., INC :
:
V : P.M. NO. 02-2778
:
ROBERT V ROSSI and LINDA A ROSSI :

**AFFIDAVIT**

I, Robert Quigley, after being first duly sworn depose and say:

1. I have personal knowledge of the facts setforth.

2. I am an insurance broker licensed by the state of Rhode Island. I am employed by the Preston Agency, Inc. as its Vice President. The Preston Agency, Inc is located at 250 Centerville Road, Warwick, Rhode Island and is duly licensed by the state of Rhode Island to broker insurance.

3. During the month of April, 2002 I received a call from Robert V. Rossi inquiring about obtaining two financial guarantee bonds to cover two mechanics' liens that were recorded against his real estate. The bond amounts were to be in the sums of $129,000.00 and $35,500.00.

4. I then investigated with various insurance companies that write or issue such bonds as to whether such bonds could be issued for Mr. Rossi and the premium cost of such bonds.

5. The insurance company required that Mr. Rossi was not previously bonded, he would have to post 100% collateral plus a total premium on both bonds in the sum of $3,290.00.

6. I then informed Mr. Rossi of the collateral requirements and cost of such bonds. Mr. Rossi then informed me that due to the premium cost and the 100% collateral requirement he did not wish to proceed with the issuance of the bonds.

Robert Quigley

Subscribed and sworn to before me this 19th day of December, 2002.

Notary Public
My Commission Expires: 6/26/05

STATE OF RHODE ISLAND
PROVIDENCE, SC.

SUPERIOR COURT

116

GEM PLUMBING AND HEATING CO., INC.
Petitioner
V.

ROBERT V. ROSSI and
LINDA A. ROSSI
Respondents

C.A. No. 02-2778

**JUDGMENT (AMENDED)**

This action came on for hearing before the court, the Honorable Silverstein, J., presiding, and the issues having been heard and a decision having been duly rendered,

It is ORDERED and ADJUDGED

1. That the above-captioned action is dismissed on the merits.

2. Respondents' funds deposited with the Registry of Court pursuant to R.I. Gen. Laws Section 34-28-17 shall be released and paid over to Respondents together with any accrued interest.

Dated at Providence, Rhode Island, this 30 day of May, 2003.

Jean Mazzacone
Clerk of Court
Dep.

Submitted by:

Patrick J. Dougherty, #5082
146 Westminster Street, Suite 401
Providence, RI 02903
(401)273-9770

## Certification

I hereby certify that I caused a copy of this Judgment to be served on Thomas Petronio, Esquire & Everett A. Petronio, Esquire, 1239 Hartford Avenue, Johnston, RI 02919, Paula Y. Francese, Esquire, 544 Douglas Avenue, Providence, RI 02908, via first class postage prepaid mail on the 30th day of May, 2003.

______________________

fense. Consistent with his broad discretion in a jury-waived trial, the trial justice may accept or reject the affirmative defense and issue a new judgment.

Because of our disposition of these issues, we need not reach the defendant's remaining assignment of error.

### Conclusion

We vacate the judgment of the Superior Court and remand this case to the trial justice for a new judgment based on an amended decision, in which the trial justice considers, but is not bound by, the defendant's affirmative defense.

## GEM PLUMBING & HEATING CO., INC.

v.

## Robert V. ROSSI et al.

No. 2003-386-Appeal.

Supreme Court of Rhode Island.

Feb. 22, 2005.

**Background:** Water and sewer contractor filed petition to enforce mechanics lien. Property owners filed motion to dismiss, alleging that Mechanics' Lien Law was unconstitutional. The Superior Court, Providence County, Michael A. Silverstein, J., entered judgment for property owners, and contractor appealed.

**Holdings:** The Supreme Court, Williams, C.J., held that:

(1) Mechanics' Lien Law would be applied as amended by Legislature, though amendments were adopted after trial court's judgment;

(2) Law qualified as state action substantial enough to implicate procedural due process protections;

(3) contractor's mechanics' lien invoked a substantial property interest for due process purposes;

(4) prompt post-deprivation hearing that Law, as amended, provided weighed in favor of finding that Law did not violate procedural due process;

(5) contractor's preexisting interest in the property arising from the material and labor it provided and State's ancillary interests weighed in favor of finding that Law did not violate due process; and

(6) Law as amended did not violate procedural due process.

Vacated and remanded.

**1. Constitutional Law ⚩255(1), 278(1)**

**Eminent Domain ⚩266**

The constitutional claim of procedural due process is manifestly different from a "taking;" the former prevents the deprivation of life, liberty, or property without due process, while the latter provides protection from the government's power of eminent domain, or, in some circumstances, excessive regulation, such that when the government literally "takes" private property for public use, the property owner may allege inverse condemnation and, if successful, is entitled to just compensation. U.S.C.A. Const.Amends. 5, 14.

**2. Statutes ⚩263, 270**

Generally, if the Legislature amends or adds a statute relevant to a case that is pending appeal, the Supreme Court will apply the law in effect at the time of the appeal, even when the statute was not in effect when judgment was entered in the trial court, particularly when the legislative intent is retrospective.



**3. Statutes ⚩262**

Statutes are given retroactive effect only when the Legislature clearly expresses such an application.

**4. Mechanics' Liens ⚩6**

In appeal of action challenging constitutionality of Mechanics' Lien Law, Supreme Court would apply the Law as amended by the Legislature following the judgment in the trial court, though property owners had paid amount of lien into the court registry and lien had been released, where amended Law stated it applied to all pending mechanics' liens, petitions or lien substitutions as of date amended Law was adopted.

**5. Mechanics' Liens ⚩5, 116**

The Mechanics' Lien Law is in derogation of the common law, and, as such, strict compliance is required. Gen.Laws 1956, § 34-28-1 et seq.

**6. Mechanics' Liens ⚩5**

Mechanics' Lien Law should be construed to carry out its intended purpose to afford a liberal remedy to all who have contributed labor or material towards adding to the value of the property to which the lien attaches. Gen.Laws 1956, § 34-28-1 et seq.

**7. Mechanics' Liens ⚩5**

Mechanics' Lien Law was designed to prevent unjust enrichment of one person at the expense of another. Gen.Laws 1956, § 34-28-1 et seq.

**8. Mechanics' Liens ⚩168, 170**

Mechanics' Lien Law creates a lien in favor of the claimant when the work begins or the materials are furnished; it accrues as the debt accrues, being incident to the improvement. Gen.Laws 1956, § 34-28-1 et seq.

**9. Constitutional Law ⚩48(1)**

In reviewing the constitutionality of statutes, the Legislature is presumed to have acted within its constitutional power.

**10. Constitutional Law ⚩48(1)**

Supreme Court will attach every reasonable intendment in favor of constitutionality in order to preserve a statute.

**11. Constitutional Law ⚩48(1)**

The party challenging the constitutionality of a statute bears the burden of proving that the statute is unconstitutional.

**12. Constitutional Law ⚩48(3)**

The challenger of a statute on constitutional grounds must prove beyond a reasonable doubt that the statute is unconstitutional.

**13. Constitutional Law ⚩254(2)**

The mere existence of a body of property law in a State, whether decisional or statutory, does not suffice as state action under the Fourteenth Amendment. U.S.C.A. Const.Amend. 14.

**14. Constitutional Law ⚩254(5)**

Mechanics' Lien Law qualifies as state action substantial enough to implicate the procedural due process protections of the Fourteenth Amendment and the Rhode Island Constitution, as government officials provide overt, significant assistance in almost every step of the mechanic's lien process; a town officer records the notices of intention perfecting the lien, a town official records the notices of lis pendens, a Superior Court clerk has a newspaper advertisement published prior to show-cause hearings, and the court registry holds the cash payment or bond in the event a property owner wishes to discharge the lien. U.S.C.A. Const.Amend. 14; Const. Art. 1, § 2; Gen.Laws 1956, § 34-28-1 et seq.

**15. Constitutional Law ⟹251.5**

Procedural due process is unlike other legal rules in that it is not a technical conception with a fixed content unrelated to time, place and circumstances. U.S.C.A. Const.Amend. 14; Const. Art. 1, § 2.

**16. Constitutional Law ⟹251.5**

The very nature of procedural due process negates any concept of inflexible procedures universally applicable to every imaginable situation. U.S.C.A. Const. Amend. 14; Const. Art. 1, § 2.

**17. Constitutional Law ⟹312(1)**

To determine whether a particular prejudgment remedy statute complies with procedural due process, a court balances: (1) the consideration of the private interest that will be affected by the prejudgment measure; (2) an examination of the risk of erroneous deprivation through the procedures under attack and the probable value of additional or alternative safeguards; and (3) giving principal attention to the interest of the party seeking the prejudgment remedy, with, nonetheless, due regard for any ancillary interest the government may have in providing the procedure or forgoing the added burden of providing greater protections. Gen.Laws 1956, § 34-28-1 et seq.

**18. Constitutional Law ⟹300(1)**

**Mechanics' Liens ⟹180**

A significant property interest was invoked by contractor's filing of mechanic's lien, for purposes of determining whether Mechanics' Lien Law violated procedural due process, though property owners maintained physical possession of the property and had the option of clearing title by posting bond, where property owners experienced clouding of title; lien impaired owners' ability to sell or otherwise alienate the property, tainted their credit rating, and reduced the chance of obtaining financing. U.S.C.A. Const.Amend. 14; Const. Art. 1, § 2; Gen.Laws 1956, § 34-28-1 et seq.

**19. Constitutional Law ⟹300(2)**

**Mechanics' Liens ⟹3**

Prompt post-deprivation hearing that Mechanics' Lien Law, as amended, would have provided to property owners weighed in favor of finding that Law did not violate procedural due process, in contractor's mechanics' lien action; Law as amended granted property owners a prompt hearing to challenge the notice of intention, the initial step in the mechanics' lien process, at any time after the mailing of the notice of intention, provided for a fast-track hearing, and placed burden on a claimant to show why the lien was valid. U.S.C.A. Const.Amend. 14; Const. Art. 1, § 2; Gen. Laws 1956, § 4-28-17.1.

**20. Constitutional Law ⟹312(4)**

A prompt post-deprivation hearing is an important factor in determining whether the procedural safeguards in a prejudgment remedy statute adequately limit erroneous deprivation and thus whether the statute complies with procedural due process; it allows the property owner to immediately challenge the deprivation. U.S.C.A. Const.Amend. 14; Const. Art. 1, § 2.

**21. Statutes ⟹188**

When the language of a statute is clear and unambiguous, a court must enforce the statute as written by giving the words of the statute their plain and ordinary meaning.

**22. Statutes ⟹190, 206**

When a statute is ambiguous, a court must apply the rules of statutory construction and examine the statute in its entirety to determine the intent and purpose of the Legislature.



**23. Statutes ⟹236, 243**

Where a statute is remedial, one which affords a remedy, or improves or facilitates remedies already existing for the enforcement of rights or redress of wrongs, it is to be construed liberally.

**24. Statutes ⟹211**

The title of an act may only aid in a court's interpretation if there is doubt as to the meaning of a provision of the statute.

**25. Mechanics' Liens ⟹160**

The burden at a show cause hearing challenging a mechanics lien is on the claimant to prove why the lien is valid. Gen.Laws 1956, § 34-28-17.1(b).

**26. Constitutional Law ⟹300(1, 2)**

**Mechanics' Liens ⟹3**

For purposes of determining in contractor's mechanics' lien action whether Mechanics' Lien Law violated procedural due process, procedural safeguards in the Law, providing for a prompt post-deprivation hearing, requiring that notice of intention to file be executed under oath and contain specified information, allowing court to award a prevailing party attorney fees, and allowing property owners to pay cash to release the lien and regain clear title, limited the risk of erroneous deprivation, despite the lack of a requirement that a claimant show extraordinary circumstances for the lien and the absence of ex parte judicial review of notice of intention. U.S.C.A. Const.Amend. 14; Const. Art. 1, § 2; Gen.Laws 1956, §§ 34-28-4(b), 34-28-17, 34-28-19.

**27. Constitutional Law ⟹300(1)**

**Mechanics' Liens ⟹3**

For purposes of determining in contractor's mechanics' lien action whether Mechanics' Lien Law violated procedural due process, contractor's preexisting interest in the property arising from the material and labor it provided that increased the value of the property, and the State's ancillary interest in encouraging construction, putting potential purchasers on notice of claims and providing a swift means for a claimants to preserve their interests, weighed strongly in favor of the constitutionality of the Law. U.S.C.A. Const. Amend. 14; Const. Art. 1, § 2; Gen.Laws 1956, § 34-28-1 et seq.

**28. Mechanics' Liens ⟹55(1), 166**

A mechanics' lien is not acquired by an adverse proceeding after the debt has been incurred, but it accrues as the debt accrues, being incident to the improvement, and therefore the owner of the estate to which it attaches consents to it when he consents to the improvement. Gen.Laws 1956, § 34-28-1 et seq.

**29. Constitutional Law ⟹300(1, 2)**

**Mechanics' Liens ⟹3**

Mechanics' Lien Law as amended does not violate procedural due process; a claimant has a preexisting interest in any property improved due to its labor and materials, the deprivation of a property owner's interest under the Law does not amount to a temporary total deprivation, and a property owner has access to a prompt post-deprivation hearing as well as other procedural safeguards. U.S.C.A. Const.Amend. 14; Const. Art. 1, § 2; Gen. Laws 1956, § 34-28-1 et seq.

---

West Codenotes

**Prior Version Recognized as Unconstitutional**

Gen.Laws 1956, §§ 10-5-2, 10-5-5.

---

Thomas M. Petronio, Greenville, for Plaintiff.

Case 1:05-cv-00032-S Document 19 Filed 04/22/2005 Page 53 of 62



Patrick J. Dougherty, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

WILLIAMS, Chief Justice.

Referencing his own inability to forecast the actions of World War II Russia, Winston Churchill once quipped "It is a riddle rapped in a mystery inside an enigma." [1] hough we candidly admit the legal issues at play in this case do not come close to the terrorism of Stalinist Russia, the ensuing opinion answers the riddle wrapped in the mystery that is the Rhode Island Mechanics' Lien Law, found at G.L.1956 Chapter 28 of Title 34, as analyzed under the enigma that is the modern procedural due process jurisprudence growing out of both the Fourteenth Amendment to the United States Constitution and Article 1, Section 2 of the Rhode Island Constitution.

This case came before the Supreme Court on January 19, 2005, on appeal from a Superior Court judgment in favor of the property owners,[2] Robert V. Rossi and ˙˙da A. Rossi (collectively Rossis), declar- that the Mechanics' Lien Law was so lean on due process protections that it rendered the statute unconstitutional. We wish to thank the Attorney General, the New England Legal Foundation, the American Subcontractors Association, Inc., the Rhode Island Subcontractors Association, and the Rhode Island Builders Association for their excellent amicus briefs. For the reasons stated herein, we vacate the judgment of the Superior Court.

## I

### Facts and Travel

In October 2000, the Rossis contracted with claimant,[3] Gem Plumbing & Heating Co., Inc. (Gem), to provide the materials and labor required for water and sewer lines in connection with an office building the Rossis were constructing in Smithfield, Rhode Island. On January 28, 2002, Gem mailed the Rossis a notice of intention to do work or furnish materials in connection with the building and recorded a copy of such notice in the land records in the Town of Smithfield, pursuant to § 34–28–4. As prescribed by statute, 120 days later, on May 28, 2002, Gem filed a petition to enforce the mechanic's lien in the Superior Court, claiming $35,500 in unpaid labor and materials. On the same day, Gem recorded a notice of lis pendens.

Subsequently, also in accordance with statutory procedure, the Rossis paid into the court registry $35,860, which equaled the total amount of Gem's claimed lien, plus costs. Thereafter the Rossis filed an *ex parte* motion to dissolve, release, and discharge the mechanic's lien and lis pendens, which the Superior Court granted on June 4, 2002, stating in its order that the amount deposited with the court registry was substituted forthwith for the mechanic's lien and lis pendens in the event that Gem eventually succeeded on the merits.

[1] On August 29, 2000, the Rossis filed a motion to dismiss, alleging that the Mechanics' Lien Law was unconstitutional because it deprived them of their property without due process of law.[4] As required by Rule 24(d) of the Superior Court Rules of Civil Procedure, the Rossis informed the Attorney General of the constitutional claim, but the State declined to intervene. On October 23, 2002, after a hearing, the motion justice entered an order inviting the Attorney General and any other party to file amicus briefs, and required that notice of such invitation be given to major building and construction trade associations. After the Attorney General and various amici curiae submitted briefs, the court heard arguments on the constitutionality of the Mechanics' Lien Law. The motion justice then issued a written decision declaring the then-statute unconstitutional. The statute, however, has been amended since that written decision, and it is the amended statute that we ultimately review today.

In that written decision analyzing the pre-amendment statute, the motion justice relied heavily upon the United States Supreme Court's most recent procedural due process opinion addressing prejudgment remedies, *Connecticut v. Doehr,* 501 U.S. 1, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991). Similar to the attachment procedure in *Doehr,* the motion justice found that a mechanic's lien clouds title; impairs the ability to sell property; taints any credit rating; reduces the chance of obtaining a home equity loan; and can place an existing mortgage in technical default.[5] The motion justice held that the "tremendous significance" of the property interest, when combined with his finding that the statutorily required sworn affidavit of the claimant was an inadequate safeguard to prevent the erroneous deprivation, significantly outweighed both a claimant's interest in a prejudgment remedy and the potential burden on the government if additional safeguards were to be required.

On May 30, 2003, the motion justice entered judgment in favor of the Rossis, dismissing the action and ordering that their funds be released from the court registry, with accrued interest. On the same day, the motion justice also issued an order staying the effect of the judgment

1. John Bartlett, *Familiar Quotations* 743 (15th ed. 1980).

2. In the interest of clarity, we will use the general term "property owner" to characterize the person or entity whose property interest has been affected by the prejudgment remedy, except when quoted authority has used a different term. The property owner otherwise would be known as the respondent, lienee, landowner, debtor, buyer or consumer.

3. Also in the interest of clarity, we will use the general term "claimant" to characterize the person or entity who seeks to employ the prejudgment remedy, except when quoted authority has used a different term. The claimant otherwise would be known as the petitioner, lienor, mechanic, materialman, creditor or seller.

4. In the motion justice's decision and in papers before this Court, the term "taking" has been employed to describe the statute's effect on the Rossis' property rights. We wish to clarify that the constitutional claim invoked here is one of procedural due process, which is manifestly different from a "taking." The former prevents the "deprivation" of life, liberty, or property without due process. The latter provides protection from the government's power of eminent domain (or, in some circumstances, excessive regulation) such that when the government literally "takes" private property for public use, the property owner may allege "inverse condemnation" and, if successful, is entitled to "just compensation." This is not a "takings" case. *See, e.g., Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922).

5. The decision also referred to a footnote in *Connecticut v. Doehr,* 501 U.S. 1, 12 n. 4, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991), to limit the Supreme Court's earlier summary affirmance of a federal district court decision, *Spielman-Fond, Inc. v. Hanson's, Inc.,* 379 F.Supp. 997 (D.Ariz.1973), *aff'd mem.,* 417 U.S. 901, 94 S.Ct. 2596, 41 L.Ed.2d 208 (1974), which held that the filing of a mechanic's lien did not amount to the deprivation of a significant property interest. The motion justice reasoned that *Doehr* precluded any reliance on *Spielman-Fond, Inc.,* stating "post-*Doehr, there is no longer any valid argument that a mechanics' lien does not implicate a significant property interest.*"

for thirty days. On June 5, 2003, Gem filed its notice of appeal, as well as a motion to stay the judgment pending appellate review by this Court. Subsequently, the motion justice declined to make the stay indefinite, instead extending it to July 10, 2003. This Court later stayed the judgment pending further order. At present, the funds deposited by the Rossis remain in the court registry.

## II

### A

### The Applicable Statute

After the motion justice declared the Mechanics' Lien Law unconstitutional, the Legislature amended the statute on July 17, 2003, by adding § 34–28–17.1.[6] Before determining the constitutionality of the Rhode Island Mechanics' Lien Law, we first must determine whether the pre-amendment statute or the post-amendment statute controls our analysis in this case.

[2] Generally, if the Legislature amends or adds a statute relevant to a case that is pending appeal, this Court will apply "the law in effect at the time of the appeal," even when the statute was not in effect when judgment was entered in the trial court. *O'Reilly v. Town of Glocester,* 621 A.2d 697, 704–05 (R.I.1993); *accord Solas v. Emergency Hiring Council,* 774 A.2d 820, 826 (R.I.2001); *Dunbar v. Tammelleo,* 673 A.2d 1063, 1067 (R.I.1996). "This is particularly true when the legislative intent is retrospective." *Dunbar,* 673 A.2d at 1067.

[3, 4] Statutes are given retroactive effect only when the Legislature clearly expresses such an application. *Pion v. Bess Eaton Donuts Flour Co.,* 637 A.2d 367, 371 (R.I.1994). Section 34–28–17.1 applies, not only to all future mechanics' liens, but also to all pending "mechanics' liens, petitions or lien substitutions" as of July 17, 2003. P.L. 2003, ch. 269, § 2; P.L. 2003, ch. 299, § 2. This language clearly intends to apply § 34–28–17.1 both prospectively to future mechanics' liens and retrospectively to pending mechanics' liens.[7] Based on the clear language of the statute and our caselaw, we are required to apply the Mechanics' Lien Law as amended by § 34–28–17.1 to this appeal.

### B

### The Mechanics of Mechanics' Liens

As we have said in the past, the Mechanics' Lien Law, having its roots in various predecessor statutes going back to 1847, has "never been a model of clarity." *Faraone v. Faraone,* 413 A.2d 90, 91 (R.I. 1980). Indeed, almost seventy years ago, in *Art Metal Construction Co. v. Knight,* 56 R.I. 228, 235, 185 A. 136, 139 (1936), this Court noted that "there is and for many years has been great uncertainty among the members of the legal profession in this state, as to the interpretation and application of the statute." Abraham Lincoln once said "[l]et nothing discourage or baffle you."[8] And so, "[d]onning our compass and machete, we venture into the thicket,"

6. For further discussion of the amended statute, *see infra* Part II.B.

7. We disagree with the Rossis' contention that the lien no longer is pending because they paid $35,860 into the registry of the Superior Court and the lien was released. This argument ignores the Legislature's intent to apply G.L.1956 § 34–28–17.1 to all pending "lien substitutions." That payment is merely a lien substitution.

8. Abraham Lincoln, Letter to Elihu B. Washburne, (Apr. 30, 1848), *in A Treasury of Lincoln Quotations* 64 (Fred Kerner ed. 1965) (1996).



and attempt to navigate this difficult statute. *McKinney v. State,* 843 A.2d 463, 466 (R.I.2004).

[5–7] The statute is in derogation of the common law, and, as such, strict compliance is required. *Art Metal Construction Co.,* 56 R.I. at 246, 185 A. at 144. Nonetheless, the statute should be construed to carry out its intended purpose to "afford a liberal remedy to all who have contributed labor or material towards adding to the value of the property to which the lien attaches." *Field & Slocomb v. Consolidated Mineral Water Co.,* 25 R.I. 319, 320, 55 A. 757, 758 (1903). The law was "designed to prevent unjust enrichment of one person at the expense of another." *Art Metal Construction Co.,* 56 R.I. at 246, 185 A. at 145.

Under § 34–28–1(a),

> "Whenever any building, canal, turnpike, railroad, or other improvement shall be constructed, erected, altered, or repaired by oral or written contract with or at the oral or written request of the owner, the owner being at the time the owner of the land on which the improvement is located, * * * the building, canal, turnpike, railroad, or other improvement, together with the land, is hereby made liable and shall stand subject to liens for all the work done by any person in the construction, erection, alteration, or reparation of such building, canal, turnpike, railroad, or other improvement, and for the materials used in the construction, erection, alteration, or reparation thereof, which have been furnished by any person."

[8] As interpreted by this Court, § 34–28–1(a) creates a lien in favor of the claimant "when the work begins or the materials are furnished * * * 'it accrues as the debt accrues, being incident to the improvement * * *.'" *Art Metal Construction Co.,* 56 R.I. at 235, 185 A. at 140. The lien, however, is not self-executing. To perfect the lien, the claimant must comply with a two-part process set forth in the statute: first, the mailing of a "notice of intention" to the property owner before or within 120 days after doing work or furnishing materials; and second, the recording of that "notice of intention" in the land records within 120 days after doing work or furnishing materials.[9] Section 34–28–4(a).

9. Referencing this Brobdingnagian section of the statute in *Faraone v. Faraone,* 413 A.2d 90, 91 (R.I.1980), we called it "a single sentence of gargantuan length." Section 34–28–4(a) states that any liens created by the statute are void unless:

> "[B]efore or within one hundred and twenty (120) days after the doing of such work or the furnishing of such materials, [the claimant] mail[s] by prepaid registered or certified mail, in either case return receipt requested, a notice of intention, hereinafter described, to do work or furnish material, or both, together with a statement that the person so mailing may within one hundred twenty (120) days after the doing of the work or the furnishing of the materials, file a copy of such notice of intention in the records of land evidence in the city or town in which the land generally described in such notice of intention is located and a further statement that the mailing of the notice of intention and the filing of the copy will perfect a lien of the person so mailing against the land under and subject to the provisions of this chapter, to the owner of record of the land at the time of the mailing, or, in the case of a lien against the interest of any lessee or tenant, to the lessee or tenant, the mailing to be addressed to the last known residence or place of business of the owner or lessee or tenant, but if no residence or place of business is known or ascertainable by the person making the mailing by inquiry of the person with whom the person making the mailing is directly dealing or otherwise, then the mailing under this section shall be to the address of the land, and also shall before or within one hundred twenty (120) days after the doing of the work or the furnishing of the materials file a copy of the notice of intention in

Section 34-28-4(b) requires that the notice of intention be executed under oath and contain: (1) the name of the property owner; (2) "[a] general description of the land sufficient to identify it"; (3) "[a] general description of the nature of the work done or * * * materials furnished" (or to be done or furnished) and "the approximate value thereof * * *"; (4) the name and address of the person for whom the work was, or is to be done, or materials furnished; (5) the "name and address of the person mailing the notice" or his or er agent for purposes of the notice and underlying lien claimed; and (6) a statement that the person so mailing "has not been paid for the work done or materials furnished." Finally, the notice of intention must be mailed by registered or certified mail with return receipt requested. Section 34-28-4(a).

Notwithstanding the foregoing, a properly perfected lien under § 34-28-4(a) becomes "void and wholly lost" unless before 120 days from the recording of the notice of intention, the claimant files a notice of lis pendens[10] in the land records as well as a petition to enforce[11] the lien in Superior Court. Section 34-28-10(a).[12] The petition to enforce must be filed on the same day or within seven days after the filing of the notice of lis pendens, and both must be filed within 120 days of the date on which the notice of intention was recorded. *Id.*

the records of land evidence in the city or town in which the land generally described in the notice of lien is located. The mailing of the notice of intention and the filing of the copy in the land evidence records together with the mailing of another copy thereof as hereinbelow provided shall perfect, subject to other sections of this chapter, the lien of the person so mailing and filing as to work done or materials furnished by the person during the one hundred and twenty (120) days prior to the mailing and thereafter * * *."

10. The notice of lis pendens must contain: (1) "[t]he name of the person against whom the petition has been or will be filed and the relationship" to the land in question; (2) "[a] description of the land by metes and bounds, or by reference to a recorded plat, by tax assessor's lot and plat, or by other legal description"; (3) the amount claimed to be due in the petition; (4) the dates of the mailing and filing of the notice of intention and the name and address of the person to whom it was mailed; and (5) the names and addresses of the claimant and his or her attorney. The notice of lis pendens must state that the person filing has filed or will file within seven days, a petition to enforce in the Superior Court. Section 34-28-11(a).

11. The petition to enforce must:

"set forth the particulars of the account or demand for which the petitioner claims a lien including the amount claimed, extras, payment made, the date or dates upon which work was done or materials furnished, shall recite the actions taken under this chapter by the petitioner for the perfection of such lien, shall particularly describe the * * * improvement, and land, and the estate and title in the improvement upon which the petitioner claims a lien. It shall include specific dates of performance of the work, providing of materials, nature of each performance, and shall pray that the lien may be enforced against the improvement * * *." Section 34-28-13.

12. In pertinent part, § 34-28-10(a) states that all liens under the statute:

"shall be void and wholly lost to any person claiming a lien under those sections, unless the person shall file a petition to enforce the lien, described in § 34-28-13, in the superior court for the county in which is situated the land upon which the * * * improvement is being or has been constructed, erected, altered, or repaired, and unless such person shall also file in the records of land evidence in the city or town in which such land is located a notice of lis pendens, * * * the petition to be filed on the same day as the notice of lis pendens, or within seven (7) days thereafter, and both the petition and the notice of lis pendens to be filed within one hundred twenty (120) days of the date of the recording of the notice of intention provided in § 34-28-4 * * *."



At the time of the motion justice's judgment on May 30, 2003, and before the amendment to the statute, the Rossis had precious few avenues for relief from a perfected lien. Pursuant to § 34-28-17, property owners could deposit a bond (or cash) equivalent to the total amount of the notice of intention (plus associated costs) into the court registry and then petition the Superior Court *ex parte* to discharge the notice of intention and lis pendens, thereby clearing title to the property. Under § 34-28-17, this option is available to the property owner at any time after the recording of the notice of intention or, alternatively, after the filing of a petition to enforce. Of course, the property owner, as respondent to the petition in Superior Court, may contest both the lien itself and the amount claimed on their merits, although the statute is unclear as to exactly *when* that contest shall be heard. Section 34-28-20. Finally, a property owner prevailing on the merits may be entitled to costs, and, in the court's discretion, attorneys' fees. Section 34-28-19.

However, P.L. 2003, ch. 269, § 1 (codified as § 34-28-17.1) enacted on July 17, 2003, significantly enhanced the rights of a property owner facing a mechanic's lien. In relevant part, § 34-28-17.1(a) provides that any owner, contractor, or other interested party who alleges:

> "(1) that any person who has provided labor, materials or equipment or has agreed to provide funding, financing or payment for labor or materials or equipment refuses to continue to provide such funding, financing or payment for labor materials [*sic*] solely because of the filing or recording of a notice of intention; or (2) it appears from the notice of intention that the claimant has no valid lien by reason of the character of or the contract for the labor, materials or equipment and for which a lien is claimed; or (3) that a notice or other instrument has not been filed or recorded in accordance with the applicable provisions of § 34-28-1 et seq.; or (4) that for any other reason a claimed lien is invalid by reason or [*sic*] failure to comply with the provisions of § 34-28-1 et seq., then in such event, such person may apply *forthwith* to the superior court for the county where the land lies for an order to show cause why the lien in question is invalid, or otherwise void, or the basis of the lien is without probability of a judgment rendered in favor of the lienor." (Emphasis added.)

Section 34-28-17.1(b) provides that such a show-cause order "shall be served upon the necessary parties no later than one week prior to the date of the scheduled hearing."

## III

## The United States Supreme Court and Procedural Due Process

The United States Supreme Court's modern procedural due process jurisprudence, as applied to prejudgment remedies, began with *Sniadach v. Family Finance Corp. of Bay View*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). The *Sniadach* Court analyzed a Wisconsin statute permitting the garnishment[13] of wages based on a request made to the court clerk. *Id.* at 338, 89 S.Ct. 1820. The statute did not require prior notice to the wage earner, but rather required service of a summons and complaint within ten days after service on the garnishee. *Id.*

13. Garnishment is a "judicial proceeding in which a creditor (or potential creditor) asks the court to order a third party who is indebted to * * * the debtor to turn over to the creditor any of the debtor's property (such as wages or bank accounts) held by that third party." Black's Law Dictionary 702 (8th ed. 1999).

The *Sniadach* Court held that the prejudgment garnishment of wages, though perhaps justifiable in "extraordinary situations," *id.* at 339, 89 S.Ct. 1820, "violate[d] the fundamental principles of due process," *id.* at 342, 89 S.Ct. 1820.

Three years later, in *Fuentes v. Shevin,* 407 U.S. 67, 69, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), the United States Supreme Court scrutinized two similar replevin[14] statutes, one from Florida and the other from Pennsylvania.[15] In both cases, property owners had purchased consumer oods under installment sales contracts, defaulted on those contracts, and then had those goods seized pursuant to writs of replevin without prior notice or hearing. *Id.* at 70–71, 92 S.Ct. 1983. Both statutes did offer some procedural safeguards limiting the risk of erroneous deprivation: a bond requirement; conclusory allegations made to a court clerk that the claimant is entitled to those specific goods; and the possibility of suit by the property owner for damages for the wrongful seizure of goods. *Id.* at 83, 92 S.Ct. 1983. Finding those safeguards inadequate, the *Fuentes* Court held that the "replevin provisions work a deprivation of property without due process of law insofar as they deny the right to a prior opportunity to be heard before chattels are taken from their possessor."[16] *Id.* at 96, 92 S.Ct. 1983.

The United States Supreme Court next reviewed a Louisiana sequestration[17] statute in *Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974). Similar to *Fuentes,* a claimant used a prejudgment remedy to seize goods after a property owner had defaulted on an installment sales contract. *Mitchell,* 416 U.S. at 601, 94 S.Ct. 1895. The sequestration statute allowed for the seizure of the goods, without prior notice or hearing, upon the claimant's sworn affidavit, *ex parte* judicial review of that affidavit, and the claimant's posting of a bond. *Id.* at 602, 94 S.Ct. 1895. The property owner then could move immediately to dissolve the writ at a subsequent hearing, at which the claimant must prove it was entitled to the prejudgment seizure. *Id.* at 606, 610, 94 S.Ct. 1895. The United States Supreme Court interpreted *Sniadach* and *Fuentes* narrowly for the proposition "that a hearing must be had before one is *finally* deprived of his [or her] property" because those cases did not "deal at all with the need for a pretermination hearing where a full and immediate post-termination hearing is provided." *Id.* at 611, 94 S.Ct. 1895 (emphasis added). Emphasizing the nature of the claimant's interest in the property and corresponding lien, *id.* at 607–10, 94 S.Ct. 1895, the United States Supreme Court held that the Louisiana sequestration statute was constitutional, *id.* at 619, 94 S.Ct. 1895.

The United States Supreme Court then examined a Georgia garnishment statute in *North Georgia Finishing, Inc. v. Di–Chem, Inc.,* 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975). In seeking payment for goods sold and delivered, the claimant filed an affidavit and bond seeking to garnish funds in the property owner's bank account. *Id.* at 604, 95 S.Ct. 719. The garnishment statute required an affidavit to be filed with a court clerk, or "some officer authorized to issue an attachment," alleging nonpayment, required the claimant to post a bond, and allowed the property owner to dissolve the garnishment by posting a counterbond to satisfy any future judgment in favor of the claimant. *Id.* at 602–03 & n. 1, 95 S.Ct. 719. The statute, however, did not provide for an immediate post-deprivation hearing "to demonstrate at least probable cause for the garnishment." *Id.* at 607, 95 S.Ct. 719. Distinguishing *Mitchell* on the grounds that the garnishment was issued without *ex parte* judicial review and that the statute did not provide for an immediate post-deprivation hearing, the United States Supreme Court declared that the garnishment statute violated the Due Process Clause. *Di–Chem, Inc.,* 419 U.S. at 605, 607–08, 95 S.Ct. 719.

The United States Supreme Court's most recent procedural due process case analyzed a state attachment[18] procedure in *Connecticut v. Doehr,* 501 U.S. 1, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991). After a physical altercation, the claimant, who was the plaintiff in an assault and battery civil action, sought to attach the defendant's home to secure the potential judgment. *Id.* at 6–7, 111 S.Ct. 2105. Without prior notice or hearing, *id.* at 5, 111 S.Ct. 2105, the attachment statute allowed for the attachment of another's real property after judicial review of an affidavit demonstrating probable cause to believe the claimant will win a judgment in the underlying civil claim, *id.* at 5–7, 111 S.Ct. 2105. Though the claimant was not required to post a bond, *id.* at 6, 111 S.Ct. 2105, the property owner could avail himself of a post-deprivation hearing to challenge the attachment, *id.* at 7, 111 S.Ct. 2105. Recognizing that the effect of the attachment of real property was not a "complete, physical, or permanent deprivation of real property" and, therefore, "less than the perhaps temporary total deprivation" found in earlier cases, *id.* at 12, 111 S.Ct. 2105, the *Doehr* Court nonetheless held that the effects of the attachment, primarily the clouding of title, deprived the property owner of a "significant" property interest, *id.* at 11, 111 S.Ct. 2105. This, however, did not end the inquiry. The *Doehr* Court proceeded to apply a balancing test[19] and concluded that the *ex parte* judicial review of the affidavit, and the post-deprivation hearing, *id.* at 14–15, 111 S.Ct. 2105, were insufficient to offset the property owner's significant property interest as compared with the claimant's *de minimis* interest in the other's real property, *id.* at 16, 111 S.Ct. 2105.[20] Accordingly, the United States Su-

14. Replevin is an "action for the repossession of personal property wrongfully taken or detained by the defendant, whereby the plaintiff gives security for and holds the property until the court decides who owns it." Black's Law Dictionary 1325 (8th ed. 1999).

15. The primary difference between the two statutes was that the Florida statute provided a post-deprivation hearing, while the Pennsylvania statute did not "require that there *ever* be opportunity for a hearing on the merits of the conflicting claims to possession of the replevied property." *Fuentes v. Shevin,* 407 U.S. 67, 77, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).

16. Based on *Fuentes,* the United States District Court for the District of Rhode Island declared the Rhode Island attachment statute, G.L. 1956 chapter 5 of title 10, unconstitutional. *McClellan v. Commercial Credit Corp.,* 350 F.Supp. 1013, 1014 (D.R.I.1972). Rhode Island then amended both the attachment statute, § 10–5–2, and Rule 4 of the Superior Court Rules of Civil Procedure to comply with due process. *Martin v. Lincoln Bar, Inc.,* 622 A.2d 464, 467 (R.I.1993). This Court later held a separate section of the statute, § 10–5–5, to be unconstitutional. *Shawmut Bank of Rhode Island v. Costello,* 643 A.2d 194, 199, 202 (R.I.1994) (noting that said section had "purportedly escaped significant review or amendment" post-*Fuentes*).

17. Sequestration is the "process by which property is removed from the possessor pending the outcome of a dispute in which two or more parties contend for it." Black's Law Dictionary 1397 (8th ed. 1999).

18. Attachment is the "seizing of a person's property to secure a judgment or to be sold in satisfaction of a judgment." Black's Law Dictionary 136 (8th ed. 1999).

19. For further discussion of the balancing test, *see infra* Part IV.B.

20. The *Doehr* Court was careful to draw distinctions between the nature of a plaintiff's rights in a tort action and a creditor's right in

preme Court held that the Connecticut attachment statute violated the Due Process Clause. *Id.* at 24, 111 S.Ct. 2105.

In holding as it did on the issue of whether the clouding of title affected a significant property interest, the *Doehr* Court limited the precedential value of its own summary affirmance of *Spielman–Fond, Inc. v. Hanson's, Inc.*, 379 F.Supp. 997, 999 (D.Ariz.1973), *aff'd mem.*, 417 U.S. 901, 94 S.Ct. 2596, 41 L.Ed.2d 208 (1974), which held that the filing of a mechanic's lien did not deprive a claimant of a significant property interest. *Doehr*, 501 U.S. at 12 n. 4, 111 S.Ct. 2105. Concluding that *Spielman–Fond, Inc.* has less value as precedent because of its summary disposition, the *Doehr* Court noted that "[t]he facts of *Spielman–Fond* presented an alternative basis for affirmance in any event." *Id.* Since a claimant in a mechanic's lien case had "a pre-existing interest in the property at issue," the "heightened" preexisting interest could "provide a ground for upholding procedures that are otherwise suspect."[21] *Id.*

## IV

## Analysis

[9–12] In reviewing the constitutionality of statutes, "[t]he Legislature is presumed to have acted within its constitutional power." *Burrillville Racing Association v. State*, 118 R.I. 154, 157, 372 A.2d 979, 982 (1977). "This [C]ourt will attach 'every reasonable intendment in favor of * * * constitutionality' in order to preserve the statute." *Lynch v. King*, 120 R.I. 868, 875, 391 A.2d 117, 121 (1978) (quoting *Prata Undertaking Co. v. State Board of Embalming and Funeral Directing*, 55 R.I. 454, 461, 182 A. 808, 811 (1936)). The party challenging such constitutionality bears the burden of proving that the statute is unconstitutional. *Rhode Island Insurers' Insolvency Fund v. Leviton Manufacturing Co.*, 716 A.2d 730, 734 (R.I.1998). The challenger must prove beyond a reasonable doubt that the statute is unconstitutional. *Id.*

### A

### State Action

[13, 14] Before reaching the procedural due process issue, we first must address Gem's argument that mechanics' liens do not involve state action and, thus, are not subject to the Fourteenth Amendment. "[T]he mere existence of a body of property law in a State, whether decisional or statutory," does not suffice as state action under the Fourteenth Amendment. *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 160 n. 10, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). In its most recent review of a prejudgment remedy under procedural due process, however, the United States Supreme Court directly addressed state action:

> "[p]rejudgment remedy statutes ordinarily apply to disputes between private parties rather than between an individual and the government. Such enactments are designed to enable one of the parties to 'make use of state procedures *with the overt, significant assistance of state officials*,' and they *undoubtedly involve state action 'substantial enough to implicate the Due Process Clause.'*"

an action on a debt. "[D]isputes between debtors and creditors more readily lend themselves to accurate *ex parte* assessments of the merits. Tort actions, like the assault and battery claim at issue here, do not." *Doehr*, 501 U.S. at 17, 111 S.Ct. 2105.

21. Chief Justice Rehnquist's concurrence in *Doehr*, joined by Justice Blackmun, further articulated the alternative basis for affirming *Spielman-Fond, Inc. See infra* Part IV.B.3.



*Doehr*, 501 U.S. at 10–11, 111 S.Ct. 2105 (emphases added).

Government officials provide "overt, significant assistance" in almost every step of the mechanics' lien process. A town official records the notice of intention perfecting the lien. Section 34–28–5. A town official records the notice of lis pendens. Section 34–28–12. Prior to a show-cause hearing to determine whether the lien should be enforced for the amount claimed, a Superior Court clerk has a newspaper advertisement published giving notice to "all persons having a lien, by virtue of this chapter, or any title, claim, lease, mortgage, attachment, or other lien or encumbrance, or any unrecorded claim on all or any part of the same property" and issues direct citations to each person listed on the petition to enforce the lien. Section 34–28–14. Finally, the court registry holds the cash payment or bond in the event the property owner wishes to discharge the lien. Section 34–28–17. Thus, the operation of our Mechanics' Lien Law qualifies as state action within the broad sweep of *Doehr.*

### B

### *Mathews–Doehr* Balancing

[15, 16] The Fourteenth Amendment to the United States Constitution prevents states from depriving "any person of life, liberty, or property, without due process of law."[22] Article 1, Section 2, of the Rhode Island Constitution similarly provides "[n]o person shall be deprived of life, liberty or property without due process of law." Due process is unlike other legal rules in that it " 'is not a technical conception with a fixed content unrelated to time, place and circumstances.' " *Cafeteria & Restaurant Workers Union, Local 473, AFL–CIO v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Id.*

[17] To determine whether a particular state statute complies with due process, we apply a balancing test first announced in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), as modified for prejudgment remedy purposes in *Doehr*, 501 U.S. at 10–11, 111 S.Ct. 2105. We balance: (1) the "consideration of the private interest that will be affected by the prejudgment measure"; (2) "an examination of the risk of erroneous deprivation through the procedures under attack and the probable value of additional or alternative safeguards"; and (3) giving "principal attention to the interest of the party seeking the prejudgment remedy, with, nonetheless, due regard for any ancillary interest the government may have in providing the procedure or forgoing the added burden of providing greater protections." *Id.* at 11, 111 S.Ct. 2105.

#### 1

#### The Rossis' Interest

[18] The first step in our *Mathews–Doehr* analysis requires us to consider the

22. For the sake of clarity, we note that the Due Process Clause contained in the Fifth Amendment to the United States Constitution does not pertain to this case. The United States Supreme Court consistently has applied the Fourteenth Amendment, rather than the Fifth Amendment, to the states in review of statutes affording prejudgment remedies. *See Doehr*, 501 U.S. at 4, 111 S.Ct. 2105; *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 601, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); *Fuentes*, 407 U.S. at 70, 92 S.Ct. 1983. The Fifth Amendment Due Process Clause, in contrast, applies to the federal government. *See Reardon v. United States*, 947 F.2d 1509, 1510 (1st Cir.1991) (en banc). Since the Fourteenth Amendment procedural Due Process Clause applies directly to the states, an application of the Fifth Amendment Due Process Clause to the states through the incorporation theory is redundant and unnecessary.

significance of the "private interest that will be affected by the prejudgment measure." *Doehr,* 501 U.S. at 11, 111 S.Ct. 2105. Discussing the effect of prejudgment attachment, the *Doehr* Court stated:

> "the property interests that attachment affects are significant. For a property owner like Doehr, attachment ordinarily clouds title; impairs the ability to sell or otherwise alienate the property; taints any credit rating; reduces the chance of obtaining a home equity loan or additional mortgage; and can even place an existing mortgage in technical default where there is an insecurity clause." *Id.*

At least so far as its effect on the Rossis' property is concerned, we discern no meaningful difference between the attachment statute at issue in *Doehr* and the mechanic's lien in the present case. In both cases the property owner maintains physical possession of the property and has the option of clearing title by posting bond. In both cases, however, the deprivation is significantly less than the "temporary total deprivation[s]" in *Sniadach* (garnishment), *Fuentes* (replevin), and *Mitchell* (sequestration). *See Doehr,* 501 U.S. at 12, 111 S.Ct. 2105. Nonetheless, the Rossis experienced the same clouding title as the *Doehr* property owners.

Gem urges application of the United States Supreme Court's summary affirmance of *Spielman–Fond, Inc.,* 379 F.Supp. at 999–1000, which held that a mechanic's lien did not amount to a deprivation of property significant enough to violate the Due Process Clause by failing to provide a pre-deprivation hearing. For purposes of the first prong of the *Mathews–Doehr* balancing test, however, the *Doehr* majority rejected *Spielman–Fond, Inc.* even though they had affirmed it in 1974. *Doehr,* 501 U.S. at 12 n. 4, 111 S.Ct. 2105 (stating *Spielman–Fond, Inc.* "does not control"). Accordingly, we reject Gem's assertions that no significant property interest is invoked by filing a mechanic's lien.

2

**The Risk of Erroneous Deprivation**

The second prong of the *Mathews–Doehr* balancing test examines "the risk of erroneous deprivation through the procedures under attack and the probable value of additional or alternative safeguards." *Doehr,* 501 U.S. at 11, 111 S.Ct. 2105. The Mechanics' Lien Law, as amended, offers the following procedures to limit the risk of erroneous deprivation: a prompt post-deprivation hearing; a detailed sworn affidavit; the property owner's ability to pay cash or post a bond to clear title; and the payment of costs and fees to the prevailing party. Since no single procedural safeguard guarantees compliance with due process, we will discuss each *seriatim* against the backdrop of the bad faith or "blackmail" factual scenario that the Rossis stressed in their brief:

> "Many times, a contractor or materialman has been paid a substantial majority portion of the total amount contracted for and then a problem arises whereby there is a dispute as to the remaining amount owed or even as to the performance under the contract. Oftentimes the dispute arises where there are allegations of misfeasance, malfeasance or simply nonfeasance as to duties of performance under the contract of construction and the owner claims he/she has been damaged in an amount exceeding any amounts due and remaining to be paid under the contract price."

i

**Hearing Pursuant to § 34–28–17.1**

**[19, 20]** A prompt post-deprivation hearing is an important factor in determining whether the procedural safeguards adequately limit erroneous deprivation; it allows the property owner to immediately challenge the deprivation. The fact that a property owner could move immediately to dissolve the writ weighed in favor of constitutionality in *Mitchell,* 416 U.S. at 610, 94 S.Ct. 1895. The *Mitchell* Court clearly did not require a pre-deprivation hearing in stating "[w]here only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for ultimate judicial determination is adequate." *Id.* at 611, 94 S.Ct. 1895 (quoting *Phillips v. Commissioner,* 283 U.S. 589, 596–97, 51 S.Ct. 608, 75 L.Ed. 1289 (1931)). In contrast, the existence of a post-deprivation hearing was insufficient to cure the constitutional defects in *Doehr,* 501 U.S. at 14–16, 111 S.Ct. 2105. Section 34–28–17.1 is a recent amendment; we shall interpret its language pursuant to the well-settled rules of statutory interpretation.



**[21–23]** "When the language of a statute is clear and unambiguous, we must enforce the statute as written by giving the words of the statute their plain and ordinary meaning." *Harvard Pilgrim Health Care of New England, Inc. v. Gelati,* 865 A.2d 1028, 1037 (R.I.2004). "But when the statute is ambiguous, we must apply the rules of statutory construction and examine the statute in its entirety to determine the intent and purpose of the Legislature." *Id.* In addition, "where the statute is remedial, one which affords a remedy, or improves or facilitates remedies already existing for the enforcement of rights or redress of wrongs, it is to be construed liberally." *Ayers–Schaffner v. Solomon,* 461 A.2d 396, 399 (R.I.1983).

The language of § 34–28–17.1 clearly affords a property owner a hearing "for an order to show cause why the lien in question is invalid, or otherwise void, or the basis of the lien is without probability of a judgment rendered in favor of the lienor." The question of *when* that hearing is to take place is critical in limiting the risk of erroneous deprivation: the more prompt the hearing, the less the risk of erroneous deprivation.

**[24, 25]** At least as to subsections (2)-(4) of § 34–28–17.1(a),[23] the statute demonstrates clear legislative intent to grant a property owner a *prompt* post-deprivation hearing based on "the notice of intention," § 34–28–17.1(a)(2), which is the initial step in the process, § 34–28–4. Furthermore, the Legislature designated such hearings as expedited show-cause proceedings. *See* Black's Law Dictionary 1413 (8th ed. 1999) (defining "show-cause proceeding" as an "expedited proceeding on a show-cause order"). In addition, the statute provides a

23. As for § 34–28–17.1(a)(1), we point out that the Legislature may wish to clarify this subsection. According to the text of this provision, an owner, contractor, or other person of interest may attack the validity of the lien by an order to show cause when

> "any person who has provided labor, materials or equipment or has agreed to provide funding, financing or payment for labor or materials or equipment refuses to continue to provide such funding, financing or payment for labor materials solely because of the filing or recording of a notice of intention." *Id.*

It appears the Legislature inadvertently left out people supplying "labor, materials or equipment" from those whose work stoppage give interested parties cause to challenge the validity of the lien, despite their presence in the first part of the subsection.

We also note that although the title of this section is "[d]ismissal of petition for other cause," that title does not affect our interpretation of the plain meaning of the statute; a lien may be challenged upon the notice of intention. Section 34–28–17.1. "The title of an act may only aid in a court's interpretation if there is doubt as to the meaning of a provision of the statute." *Town of East Greenwich v. O'Neil,* 617 A.2d 104, 109 (R.I. 1992).

service timeline that is faster than for a run-of-the-mill motion hearing. *Compare* § 34–28–17.1(b) (seven days prior to a hearing) *with* Super.R.Civ.P. 6(c) (ten days prior to a hearing). Finally, the Legislature's selection of the word "forthwith" in conjunction with its choice of the show-cause procedures and expedited return date indicates a clear intention that the Superior Court fast-track such hearings. Section 34–28–17.1(a). Thus, consistent with our rules of construction, we interpret this remedial statute to provide a property owner (as well as a contractor or other person of interest), *at any time after the mailing of the notice of intention*—and, significantly, *potentially before the lien is perfected*—the opportunity to challenge the claimed lien on a number of grounds, including its substantive invalidity, or for some other procedural defect under the statute.[24] We further conclude the Legislature intended for such actions to be given priority on the Superior Court calendar so that property owners indeed may bring their challenges "forthwith" and be heard "forthwith."

Even when the notice of intention is mailed and recorded in the land evidence records on the same day, a property owner's right to a prompt post-deprivation hearing, pursuant to § 34–28–17.1, affords him or her considerable due process protection.[25] Thus, the prompt post-deprivation hearing weighs in favor of a finding of constitutionality.

Finally, we pause to acknowledge an especially peculiar facet of this case. Although our caselaw clearly establishes that we must apply the amended statute on appeal, we note that § 34–28–17.1 did not exist at the time the motion justice analyzed the constitutional question we address today.

### ii

### Other Procedural Safeguards Afforded

[26] Among the other procedural safeguards analyzed under this prong is the so-called "detailed affidavit." Certain sworn affidavits have been held insufficient to support constitutionality of prejudgment remedy statutes on multiple occasions. *Doehr,* 501 U.S. at 6, 14, 111 S.Ct. 2105 (describing the affidavit as "five one-sentence paragraphs"); *Di-Chem, Inc.,* 419 U.S. at 607, 95 S.Ct. 719 (describing the affidavit as containing only "conclusory allegations"); *Fuentes,* 407 U.S. at 83, 92 S.Ct. 1983 (describing the affidavit as "alleg[ing] conclusorily that he is entitled to specific goods"). In contrast, a sworn affidavit affords greater protection when it pertains to "ordinarily uncomplicated matters that lend themselves to documentary proof" such as the creditor/debtor relationship in *Mitchell,* 416 U.S. at 609, 94 S.Ct. 1895.

As stated previously, § 34–28–4(b) requires that the notice of intention must be executed under oath and contain: (1) the name of the property owner; (2) "[a] general description of the land sufficient to identify it"; (3) "[a] general description of the nature of the work done or * * * materials furnished" (or to be done or furnished) and "the approximate value thereof * * *"; (4) the name and address of the person for whom the work was, or is to be done, or materials furnished; (5) the "name and address of the person mailing the notice" or his or her agent for purposes of the notice and underlying lien claimed; and (6) a statement that the person so mailing "has not been paid for the work done or materials furnished." A review of the notice of intention form provided in the statute leads us to conclude it is a detailed, but mostly conclusory, sworn affidavit. *See* § 34–28–4(c) (form). Even so, this factor weighs slightly in favor of constitutionality.

The statute offers two ancillary procedural safeguards further limiting the risk of erroneous deprivation. First, § 34–28–19 grants the Superior Court the express power to grant a prevailing party "reasonable expenses" including "legal interest, costs of advertising" and "attorneys' fees." Thus, claimants who use the statute for reasons other than to secure payment for work done should be dissuaded from doing so by the threat of pecuniary loss.

Second, § 34–28–17 allows the property owner to pay cash into or post a bond with the court registry to release the lien and regain clear title to the property. Although we agree with the motion justice that the release of the lien in this way does not render the property owner's deprivation insignificant, we do not think the provision is irrelevant to our inquiry; the possibility of promptly clearing title does minimize the risk of erroneous deprivation. The effect of a clouded title during a time-sensitive sale of real property is much more coercive than a cash payment or the posting of a bond. A property owner, by unilaterally clearing title with a bond or cash payment, can thwart those potentially coercive effects. The claimant's knowledge of § 34–28–17 limits erroneous deprivation.

### iii

### Procedural Safeguards Afforded by Other Prejudgment Remedy Statutes

The prejudgment remedy statutes analyzed by the United States Supreme Court have afforded other procedural safeguards not included in the amended Mechanics' Lien Law: a showing of extraordinary circumstances and *ex parte* judicial scrutiny of an affidavit before the lien is perfected. We briefly discuss these safeguards to determine the probable value of additional due process protection.

The United States Supreme Court's caselaw on extraordinary circumstances (sometimes referred to as exigent circum-

24. At oral argument, we raised the question of whether the amended statute places the burden of proof on either the property owner or the claimant at a hearing pursuant to § 34–28–17.1. Clearly, the property owner bears the initial burden of moving for the hearing. Section 34–28–17.1(a)(4) ("[A]ny person in interest, including, but not limited to an owner or contractor * * * may apply forthwith * * * for an order to show cause * * *.").

Who bears the actual burden of proof at the hearing is less clear. The statute specifically labels the hearing as "an order to show cause." *Id.* The statute then modifies "an order to show cause" with the phrase "why the lien in question is invalid, or otherwise void, or the basis of the lien is without probability of a judgment rendered in favor of the lienor" suggesting the burden is placed on the property owner to prove that the lien is invalid. *Id.* In contrast, subsection (b) reads "An order of notice to appear and show cause why the relief demanded in the complaint should not be granted" suggesting the burden is placed on the claimant to prove that the lien is valid. Section 34–28–17.1(b). Given the remedial nature of the statute, we resolve this discrepancy in favor of the property owner and conclude that the burden at the ensuing "show cause" hearing is on the claimant to prove why the lien is valid.

25. The fact that, pursuant to § 34–28–4, a claimant may mail the notice of intention before perfecting the lien is worthy of further note. Except when the notice of intention is mailed and filed on the same day, the property owner necessarily has some *prior* notice of the future encumbrance. Thus, mechanics' liens may be distinguishable from many of the other prejudgment remedies examined by the United States Supreme Court, which reviewed statutes affording prejudgment remedies without *notice and an opportunity to be heard. See Mitchell,* 416 U.S. at 601, 94 S.Ct. 1895; *Fuentes,* 407 U.S. at 70, 92 S.Ct. 1983. Furthermore, if the property owner avails himself or herself of a hearing promptly upon receipt of a notice of intention, then he or she could receive prior notice and an opportunity to be heard on the future encumbrance.

stances) is without a doubt the most confusing aspect of the law in this area.[26] In any case, this Court's interpretation of the procedural due process cases is that under the current *Mathews–Doehr* balancing test, extraordinary circumstances is simply a factor, and thus, not required, or, in the alternative, the particulars of the situation giving rise to mechanics' liens is a per se extraordinary circumstance.[27] The first

26. Perhaps the best example of this confusion is the comparison of *Mitchell* with the *Sniadach/Fuentes* cases. In striking down Wisconsin's garnishment statute, the *Sniadach* Court acknowledged that "[s]uch summary procedure may well meet the requirements of due process in extraordinary situations." *Sniadach v. Family Finance Corp. of Bay View,* 395 U.S. 337, 339, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). Likewise the *Fuentes* Court noted that the statutes struck down in that case did not "limit the summary seizure of goods to special situations demanding prompt action [such as where] a creditor could make a showing of immediate danger that a debtor will destroy or conceal disputed goods." *Fuentes,* 407 U.S. at 93, 92 S.Ct. 1983.

Nonetheless, the *Mitchell* Court upheld a Louisiana sequestration law that required *no* showing of extraordinary circumstances. *Mitchell,* 416 U.S. at 605 n. 4, 94 S.Ct. 1895 (noting that under the statute in question "the apprehension of the creditor is no longer the issue, and the writ may be obtained when the goods are within the power of the debtor"). The *Mitchell* Court took pains to limit *Sniadach* and *Fuentes* to their facts. *See Mitchell,* 416 U.S. at 614–15, 94 S.Ct. 1895. Conspicuously absent from the *Mitchell* opinion is any explicit discussion of the presence or lack thereof of extraordinary circumstances.

The subsequent cases merely have added to this conundrum. *North Georgia Finishing, Inc. v. Di-Chem, Inc.,* 419 U.S. 601, 607, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975), does not mention extraordinary circumstances whatsoever, preferring more of a comparative approach in its holding that "[t]he Georgia garnishment statute has none of the saving characteristics of the Louisiana statute" upheld in *Mitchell. See also Di-Chem, Inc.,* 419 U.S. at 614, 95 S.Ct. 719 (Blackmun, J. dissenting) (noting the Court did "little more than make very general and very sparse comparisons"). In contrast, the *Doehr* Court, breathed new life—and new confusion—into the extraordinary circumstances issue within its first paragraph. *Doehr,* 501 U.S. at 4, 111 S.Ct. 2105. However, the *Doehr* Court did not expressly state that extraordinary circumstances *were required* in prejudgment remedy cases, nor did the Court do anything to clarify the definition of the term. At the same time, *Doehr* did nothing to otherwise limit *Mitchell,* except perhaps to note that the dispute in *Doehr* was less susceptible to uncomplicated documentary proof and that the *Doehr* plaintiffs did not have a preexisting interest as the claimant had in *Mitchell. See Doehr,* 501 U.S. at 14, 16, 111 S.Ct. 2105.

27. As noted in the text, *Doehr* seems to indicate that, at least in the case of mechanics' liens, either no extraordinary circumstances are required, or that the mechanics' lien situation is per se an extraordinary circumstance. Two points are central to both interpretations. First, the *Doehr* Court cited to *Mitchell* as an extraordinary circumstances case when it noted that

> "there was no allegation that Doehr was about to transfer or encumber his real estate or take any other action during the pendency of the action that would render his real estate unavailable to satisfy a judgment. Our cases have recognized such a properly supported claim would be an exigent circumstance permitting postponing any notice or hearing until after the attachment is effected." *Doehr,* 501 U.S. at 16, 111 S.Ct. 2105.

However, the *Mitchell* case made no reference to extraordinary circumstances as an aspect of due process beyond noting that the statute in question did not require any such showing. *Mitchell,* 416 U.S. at 605 n. 4, 94 S.Ct. 1895. As such, the only reasonable interpretation is that the *Doehr* Court was referring to the threat of loss to the *Mitchell* claimant's preexisting interest in the property *as a kind of extraordinary circumstance.* If this is a correct reading of *Doehr,* it seems that, absent a properly perfected lien, a claimant—who cannot remove the value of labor or materials added to a property—faces the same risk of loss to a bona fide purchaser.

In addition, the *Doehr* Court's statement about an "alternative basis for affirmance" of *Spielman–Fond, Inc.,* indicates that perhaps



interpretation is based on the fact that the *Mitchell* case upheld a Louisiana sequestration statute that did *not require extraordinary circumstances. See generally Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974). The second interpretation is based on *Doehr's* statement that "*Spielman–Fond* presented an alternative basis for affirmance in any event" because "the mechanic[s'] lien statute in *Spielman–Fond* required the creditor to have a pre-existing interest in the property at issue * * * [that] in certain circumstances can provide a ground for upholding procedures that are otherwise suspect." *Doehr,* 501 U.S. at 12 n. 4, 111 S.Ct. 2105.

*Ex parte* judicial scrutiny of the affidavit before the lien is filed has been treated differently at different times by the United States Supreme Court. The *Mitchell* Court placed significant reliance on that safeguard in upholding the sequestration statute. *Mitchell,* 416 U.S. at 616–17, 94 S.Ct. 1895. In contrast, the *Doehr* Court stated the judicial review of "factual allegations that were sufficient to state a cause of action but which the defendant would dispute" presents a great "potential for unwarranted attachment," because "the judge could make no realistic assessment concerning the likelihood of an action's success based upon these one-sided, self-serving, and conclusory submissions." *Doehr,* 501 U.S. at 13–14, 111 S.Ct. 2105. Accordingly, the likelihood is minimal that *ex parte* judicial scrutiny of an affidavit before perfecting the lien would decrease the risk of erroneous deprivation.

To summarize our analysis of the second *Mathews–Doehr* prong, despite the lack of a showing of extraordinary circumstances and *ex parte* judicial review of the affidavit, the procedural safeguards that the statute employs, primarily the prompt post-deprivation hearing, limits the risk of erroneous deprivation.

### 3

### Gem's Interest and "Due Regard" for Rhode Island's Interest

[27] The third prong of the *Mathews–Doehr* test examines Gem's interests, with due regard given to any ancillary interest the government may have in providing or forgoing additional protections. *Doehr,* 501 U.S. at 11, 111 S.Ct. 2105. The *Doehr* Court stressed that the tort claimant in that case had no actual interest in the attached property. "His only interest in attaching the property was to ensure the availability of assets to satisfy his judgment if he prevailed on the merits * * *." *Id.* at 16, 111 S.Ct. 2105. Along similar lines, the motion justice hastily treated Gem's interest in this case in a single sentence: "while a potential claimant certainly has an interest in getting paid; that claimant, like all others, can suffer through

mechanics' liens either present an extraordinary circumstance or that such a circumstance is not required. *See Doehr,* 501 U.S. at 12 n. 4, 111 S.Ct. 2105. The critical footnote states: "[t]he facts of *Spielman–Fond,* presented an alternative basis for affirmance in any event. Unlike the case before us, the mechanic[s'] lien statute in *Spielman–Fond* required the creditor to have a pre-existing interest in the property at issue * * * a heightened plaintiff interest in certain circumstances can provide a ground for upholding procedures that are otherwise suspect." *Id.*

A cursory review of the original *Spielman–Fond, Inc.* case (which was cursory itself) shows the case was a run-of-the-mill mechanics' lien situation. No extraordinary circumstances were alleged. The claimants simply alleged that they had not been paid. *Spielman–Fond, Inc.,* 379 F.Supp. at 997. Accordingly, either the United States Supreme Court considers the mechanics' lien situation some sort of extraordinary situation, or, alternatively, no such showing is required.

the constitutionally-required exercise of a hearing * * *."

In his *Doehr* concurrence, Chief Justice Rehnquist compellingly distinguished the *Doehr* situation from one involving a mechanic's lien, while stressing the importance of the claimant's preexisting interest in the real property subject to lien.

> "[I]n *Spielman–Fond, Inc.*, * * * there was * * * an alternative basis available to this Court for affirmance of that decision. *Arizona recognized a pre-existing lien in favor of unpaid mechanics and materialmen who had contributed labor or supplies which were incorporated in improvements to real property.* The existence of such a lien upon the very property ultimately posted or noticed distinguishes those cases from the present one, where the plaintiff had no pre-existing interest in the real property which he sought to attach. Materialmen's and mechanic's lien statutes award an interest in real property to workers who have contributed their labor, and to suppliers who have furnished material, for the improvement of the real property. Since neither the labor nor the material can be reclaimed once it has become a part of the realty, this is the only method by which workmen or small businessmen who have contributed to the improvement of the property may be given a remedy against a property owner who has defaulted on his promise to pay for the labor and the materials. To require any sort of a contested court hearing or bond before the notice of lien takes effect would largely defeat the purpose of these statutes." *Doehr,* 501 U.S. at 28, 111 S.Ct. 2105 (emphasis added).

Like the Arizona statute referenced by Chief Justice Rehnquist, the Rhode Island Mechanics' Lien Law recognizes a preexisting interest in claimants who, through their hard work and materials, increase the value of an owner's property while having no means later to undo the improvement. As noted above,[28] § 34–28–1(a) makes any improvement and the land upon which the improvement sits "liable and * * * subject to liens for all the work done by any person * * * [as well as] for the materials used" in the doing of any such improvement.

[28] This Court's interpretation of the statute (and its predecessors)—for more than a century—has been that the mechanic's lien "comes into existence when the work begins or the materials are furnished." *Art Metal Construction Co.,* 56 R.I. at 235, 185 A. at 140. "It is not acquired by an adverse proceeding after the debt has been incurred, but it accrues as the debt accrues, being incident to the improvement, and therefore the owner of the estate to which it attaches consents to it when he consents to the improvement." [29] *Id.* at 235–36, 185 A. at 140 (quoting *Briggs v. Titus,* 13 R.I. 136, 138 (1880)).

The First, Second and Tenth Circuits have acknowledged the preexisting interest theory in post-*Doehr* cases. *See Shaumyan v. O'Neill,* 987 F.2d 122, 127–28 (2d Cir.1993) (noting in its prong three analysis that when the claimants in that case pursued prejudgment attachment based on a contract action, nonetheless, "even

28. *See supra* Part II.B.

29. The Rossis argue that there is an unfounded assumption that a claimant necessarily *adds* value to the property. In light of *Art Metal Construction Co.,* this argument fails. Although the precise amount, if any, owed to a claimant is a question that in the end will be resolved at trial under contract principles, there is usually *some* value in the work performed—even if it is not the face value of the alleged debt.



though [the claimant] failed to file and perfect a mechanic's lien, [the claimant's] unperfected lien nonetheless constituted an interest in the [the property owners'] real property"); *Cobb v. Saturn Land Co.,* 966 F.2d 1334, 1337 (10th Cir.1992) (citing *Doehr* for the proposition that unpaid claimants, under an Okalahoma statute, "*already possess[ed]* an oil and gas lien before anything is ever filed for purposes of implementation and enforcement"); *Reardon v. United States,* 947 F.2d 1509, 1521–22 (1st Cir.1991) (en banc) (distinguishing a statutory lien pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, from mechanics' liens because, unlike those claimants, the EPA had no recognized preexisting interest in the Reardons' property). Likewise, state courts have also recognized the preexisting interest cited in *Doehr. See Red Rooster Construction Co. v. River Associates, Inc.,* 224 Conn. 563, 620 A.2d 118, 124 (1993) (citing *Doehr* for the proposition that "mechanic's lien statutes serve to protect *creditors'* preexisting interests in the property at issue"); *Haimbaugh Landscaping, Inc. v. Jegen,* 653 N.E.2d 95, 110 (Ind.Ct.App.1995) (noting that "*Doehr* makes clear that [claimants] have a 'pre-existing' or a 'heightened' interest"). Clearly, after *Doehr,* no analysis of the constitutionality of mechanics' liens is complete without a discussion of a claimant's preexisting interest in the real property improved by his labor.[30]

Finally, we address the State's interest in the Mechanics' Lien Law. In *Doehr,* the United States Supreme Court noted that "[n]o interest the government may have affects the analysis. The State's interest in protecting any rights of the plaintiff cannot be any more weighty than those rights themselves." *Doehr,* 501 U.S. at 16, 111 S.Ct. 2105. In contrast, given Gem's significant preexisting lien, the State's interest in providing a protective mechanism is indeed "weighty." The statute itself represents a kind of balancing of competing property interests, as well as a policy choice intended to encourage construction. *See AMI Operating Partners Limited Partnership v. JAD Enterprises, Inc.,* 77 Md.App. 654, 551 A.2d 888, 893 (Spec.App.1989) (noting that " 'mechanics' lien statutes, in an endeavor to provide for the public welfare, are designed to encourage construction by ensuring that those who contribute to a project are compensated for their efforts' ").

In terms of forgoing additional procedures,[31] the State has an additional interest in putting potential purchasers on notice of all claims to prevent the type of complex third-party disputes that inevitably would result from transfers of such property. *Cf. New Destiny Development Corp. v. Piccione,* 802 F.Supp. 692, 698 n. 9 (D.Conn.1992) (discussing Connecticut's interest in its lis pendens statute). Recognizing that properties often change hands several times in development, the mechanics' lien statute provides a swift means for a claimant to preserve his or her interest relative to subsequent bona fide purchasers.[32]

30. In upholding the constitutionality of Louisiana's sequestration statute, the *Mitchell* Court found significant the preexisting interest of the claimants, noting that, based on that interest and the risk of deteriorated value to consumer goods by continued use in the hands of the property owner, the state "was entitled to recognize this reality and to provide somewhat more protection for the seller." *Mitchell,* 416 U.S. at 608, 94 S.Ct. 1895.

31. We note that the administrative burden of additional procedures is unlikely to greatly exceed any judicial and administrative burden inherent in § 34–28–17.1's show-cause procedures.

32. The State also has an interest in the constitutionality of the Mechanics' Lien Law to the extent that a holding to the contrary would render other statutory prejudgment liens con-

Accordingly, we hold that Gem's preexisting interest in the property and the State of Rhode Island's ancillary interest weigh strongly in favor of constitutionality.

### Conclusion

[29] Giving due consideration to all three prongs of the *Mathews–Doehr* balancing test, we conclude that the Mechanics' Lien Law, as amended by § 34–28–17.1, does not violate the Due Process Clauses of the Fourteenth Amendment to the United States Constitution or Article 1, Section 2 of the Rhode Island Constitution. Tipping the scales in favor of constitutionality is the combination of the claimant's statutory preexisting interest in the property and the availability of a prompt post-deprivation hearing. The claimant's preexisting interest is especially weighty when compared with the property owner's interest in a clear title, the deprivation of which was not a "temporary total deprivation." Also, the property owner's access to a prompt post-deprivation hearing pursuant to § 34–28–17.1, when combined with the other procedural safeguards afforded by the statute, limits the risk of erroneous deprivation. In light of the presumption of constitutionality required by the applicable standard of review, we hold that the Rhode Island Mechanics' Lien Law, chapter 28 of title 34, is constitutional.[33]

Once again, it is necessary to restate our more than seventy-year-old concerns about the Rhode Island Mechanics' Lien Law. This Court consistently has noted that the statute lacks clarity, not merely to empathize with local practitioners and judges who struggle with its complexity, but rather with the hope that our Legislature would rewrite the statute so that all could read it, comprehend it and apply it without continually turning to this Court. Our descriptions of provisions of the statute as "a single sentence of gargantuan [and now Brobdingnagian] length" have fallen on deaf ears. *Faraone,* 413 A.2d at 91. Pleas for clarity from members of the bar have not produced results. *See* Christopher H. Little, *The Rhode Island Mechanics' Lien Law: A Plea (and Proposal) for Clarity and Fairness,* 3 Roger Williams U.L. Rev. 207 (1998). In fact, even amended § 34–28–17.1(a)(1) lacks clarity. A more plainly written and user-friendly statute would benefit all involved. Thus, our holding that the statute passes constitutional muster should not be read as an endorsement of the statute in its current form.

For the reasons stated herein and because the motion justice did not have an opportunity to review the Mechanics' Lien Law as amended by § 34–28–17.1, we vacate the judgment of the Superior Court. The record shall be remanded to the Superior Court.

stitutionally suspect—a situation that arguably might lead to chaos in the marketplace. The Legislature has created a number of such liens including tax liens on real property, G.L.1956 § 44–9–1; attorney's liens, G.L. 1956 § 9–3–1; hospital liens, § 9–3–4; and motor vehicle repairer's liens, § 9–3–9, as well as a multitude of others too numerous to list here.

33. Although we uphold the constitutionality of the statute as written, we recognize that additional procedural safeguards would further limit the risk of erroneous deprivation. The Legislature, in its policymaking role, is free to enact additional procedural safeguards should it determine any are prudent. Our analysis of constitutionality is not a determination of what is, and what is not, sound policy.



## F.C.C., INC.

v.

## Richard A. REUTER, et al.

No. 2003–583–Appeal.

Supreme Court of Rhode Island.

Feb. 22, 2005.

**Background:** Contractor petitioned to enforce mechanics' lien on homeowners' property. Homeowners moved for summary judgment on ground that mechanics' lien statute was unconstitutional deprivation of due process rights. The Superior Court, Washington County, Allen P. Rubine, J., entered judgment for homeowners and dismissed action. Contractor appealed.

**Holding:** The Supreme Court, Flaherty, J., held that amended mechanics' lien statute did not deprive homeowners of their due process rights.

Reversed and remanded.

**1. Appeal and Error ⇐893(1)**

Granting of a summary judgment motion is reviewed de novo, applying the same criteria used by the trial justice.

**2. Appeal and Error ⇐863, 934(1)**

Summary judgment will be affirmed on appeal if, after reviewing the admissible evidence in the light most favorable to the nonmoving party, the reviewing court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.

**3. Constitutional Law ⇐48(1)**

In cases that challenge the constitutionality of a statute, the party challenging its validity bears the burden of proving that the statute is unconstitutional.

**4. Statutes ⇐262, 263**

When the law changes while a case is pending appeal, the Supreme Court will apply the law in effect at the time of the appeal, particularly when the legislature has indicated that a statutory provision is to have retroactive effect.

**5. Constitutional Law ⇐300(1)**

**Mechanics' Liens ⇐3**

Amended mechanics' lien statute that provided homeowners an opportunity for hearing on the validity of a lien did not violate the homeowners' due process rights. U.S.C.A. Const.Amend. 14; Gen. Laws 1956, § 34–28–17.1.

---

Robert E. Bollengier, Warwick, for Plaintiff.

Justin T. Shay, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

### OPINION

FLAHERTY, Justice.

In this appeal we are called upon to determine the constitutionality of G.L. 1956 chapter 28 of title 34, the so called mechanics' lien statute. Our decision in this controversy comes on the heels of our holding in *Gem Plumbing & Heating Co. v. Rossi,* 867 A.2d 796 (R.I.2005) in which we declared the mechanics' lien statute to be constitutional, particularly as amended on July 17, 2003, (P.L. 2003, ch. 269, §§ 1, 2), and codified at § 34–28–17.1.[1] In this

1. General Laws 1956 § 34–28–17.1 also was amended by P.L. 2003, ch. 299, § 1. The compiler redesignated the subsections and